UNITED STATES of America, Plaintiff,

v.

COFFEEVILLE CONSOLIDATED SCHOOL DISTRICT et al., Defendants.

Stephen BROWN et al., Plaintiffs,

v.

COFFEEVILLE CONSOLIDATED SCHOOL DISTRICT et al., Defendants.

Nos. WC 69-47-K, WC 70-47-K.

United States District Court, N. D. Mississippi, W. D.

Oct. 12, 1973.

H. M. Ray, U. S. Atty., James O. Ford, Oxford, Miss., for plaintiffs.

Hardy Lott, Greenwood, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This suit seeks the reinstatement, award of back pay, and other relief for six black teachers, Alma Faye Chapman, Robert Bennett, Martha Faye Bolton, William Shelton, James A. Lewis, and Evelyn R. Miller, who were dismissed, or whose contracts were not renewed, for the 1971–72 school year by the Coffeeville Consolidated School District. Each teacher had been employed in the formerly black schools at Coffeeville prior to court-ordered desegregation.

When the six teachers were notified that their contracts were not to be renewed, they sought to learn the reasons for their dismissal and obtain a hearing before the school board. Superintendent George Denley on June 5, 1971, sent each teacher a formal notice assigning the reasons for dismissal, listing names of witnesses and giving summary of proposed adverse testimony. The school board afforded the teachers a series of hearings which began June 21 and ended July 5. Adversary evidence was offered at the hearing, with the teachers being represented by counsel. At the conclusion of the hearings, the board upheld the superintendent's action and refused to reinstate any of the teachers.

The evidence before the school board was taken by a court reporter who became ill and was for a period of months unable to transcribe her notes. On September 9, 1971, plaintiffs, who were black school patrons, moved the court for a preliminary injunction for reinstatement of the six teachers pending the final adjudication of their rights. Following an evidentiary hearing September 17, 1971, the court declined to grant any relief for the six teachers until it had an opportunity to review the record before the school board.

Because of the court reporter's prolonged failure to make timely submission of her transcribed notes, and crowded court docket conditions, the case was not heard finally until June 14, 1973, when it was submitted on the basis of the transcribed evidence before the school board and additional live testimony offered by both sides. Following oral argument of counsel, the court directed that memorandum briefs be submitted on the single issue of the applicability of Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5 Cir. 1970), cert. denied 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, to the case sub judice.

Certain background facts should be stated in this protracted school desegregation case. This action originated on July 10, 1969, when the United States, in a suit brought by the Attorney General, sought to enjoin the school board and its superintendent from continuing to operate a dual school system based on pupils' freedom of choice, which had proved to be ineffective. On October 17, 1969, the court directed that the school board submit, not later than February 1, 1970, a new desegregation plan for the complete elimination of all vestiges of the dual school system. On January 29, 1970, the school district submitted a proposed plan of student desegregation on the basis of separate schools for boys and girls in the Coffeeville and Oakland attendance zones, effective September 1970. Despite the government's objections, the court on March 12, 1970, approved the board's plan of student desegregation and entered the standard *Singleton* order concerning desegregation of faculty and other staff.[1] Protesting the

---

1. "The Board of Trustees of Coffeeville Consolidated School District is further ordered to take the following action, effective not later than September 1, 1970:

DESEGREGATION OF FACULTY AND OTHER STAFF

The said Board of Trustees shall announce and implement the following policies:

(1) Effective not later than September 1, 1970, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. *The provisions of this paragraph shall be satisfied by hav-*

approved plan of student desegregation, black students and parents on September 3, 1970, instituted a separate action which was consolidated with the first suit. After further evidentiary hearing, the court on October 9, 1970, modified its prior order to eliminate student assignment based upon separation of sex, effective at the end of the first semester of the 1970–71 school year, and forthwith directed the board to submit a new plan of student assignment based upon pairing and zoning. The board submitted a new plan, which had the approval of an advisory biracial committee and was without objection from private plaintiffs; this plan was approved by the court on December 3, 1970, effective for the second semester.

During the first semester and continuing into the second semester of the 1970–71 school year, a substantial number of black students boycotted the schools; and certain members of the black community organized marches and boycotted Coffeeville merchants to publicize their grievances of racial discrimination. Following the court's approval of the second semester plan, the private plaintiffs complained of demotion of three black teachers from coaching positions, and the court in Feb-

---

*ing substantially an equal number of white and black teachers on each faculty in each of the District's schools.*

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

(2) Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

.(3) *If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff members to be dismissed or demoted must be selected on the basis of objective and reasonable nondiscriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.*

*Prior to such a reduction, the Board will develop or require the development of nonracial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district.* The school district shall also record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

"Demotion" as used above includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

In the event that the system, in connection with its conversion to a unitary system, plans to dismiss or demote personnel, as those terms are used in the preceding paragraph, a report containing the following information shall be filed with the court and served upon the parties by June 1, 1970:

(a) The system's non-racial objective criteria used in selecting the staff member(s) dismissed or demoted;

(b) The name, address, race, type of certificate held, degree or degrees held, total teaching experience and experience in the system and position during the 1969–70 school year of each person to be dismissed, or demoted, as defined above; and in the case of a demotion, the person's new position during the 1970–71 school year and his salaries for 1969–70 and 1970–71;

(c) The basis for the dismissal or demotion of each person, including the procedure employed in applying the system's non-racial, objective criteria;

(d) Whether or not the person to be dismissed or demoted was offered any other staff vacancy; and if so, the outcome; and, if not, the reason." (Emphasis added).

ruary 1971, after full hearing, ordered that they be restored to their coaching responsibilities with salary supplements they enjoyed during the first semester.[2]

As a result of flight by white students to private schools and boycott of the public schools by black students, the student average daily attendance (ADA) in the district's schools following the first desegregation order declined sharply, from 1562 in 1969–70 to 918 in 1970–71. This caused the school district to deem that it was faced with a prospective loss of 24 teacher units paid by state funds, since the state employed a formula of one teacher for every 27 students (ADA) for the previous school year. This was the outlook in April, when contracts were customarily tendered to teachers, and the six in question were not rehired. By May 1971, the ADA was up to 1211, the highest attendance of any month during the school year; and this figure then became the tentative ADA anticipated for the next school year. By a 1971 change in state statute[3] it became possible for the school district to obtain teacher units based upon the second and third months' ADA of the 1971–72 school year. By this new method of calculation, the district would lose 15 teacher units in state funds. The school officials were aware of this potential loss when they sought to hire teachers new to the system. That a faculty reduction in some degree was required by the ADA formula was clearly expressed by the superintendent's notice to each of the six teachers as stated in the margin below.[4]

Cognizant of the foregoing faculty problems, the superintendent in March and April had his principals and Title I supervisors evaluate all teachers in their respective schools or departments. These evaluations were made on printed forms which called for the detailed rating of a teacher in subjective areas as professional competence, professional attitude and personal fitness for teaching. The superintendent and the board did not adopt, promulgate, and publicly post criteria based upon such objective standards as degrees and certificates held, hours of advanced study, grade or subject matter specialty, or years of teaching either in the system or elsewhere; nor were such criteria used to determine which teachers should be dismissed in view of the anticipated reduction in faculty. Moreover, no effort was made to coordinate the subjective evaluations made by the different principals and supervisors to determine the ranking of teachers in the system as a whole.

At the close of that school year, 31 classroom teachers left the system. Of

2. These three black teachers were Malla Pulliam, restored as head baseball coach, Ms. Curtis, restored as girls' track coach, and Robert Bennett (one of the teachers involved in the present dismissal), restored as head track coach.

3. Miss.Code § 6248–02, as amended by Chap. 363, Laws of 1971.

4. "The School District will not require as many classroom teachers for the 1971–72 school year as it had for the 1970–71 year because of a drop in the number of students attending the schools of the School District, and it would wreck the School District financially to contract with as many teachers for the 1971–72 school year as it contracted with for the 1970–71 school year. The State of Mississippi allots one teacher for each 27 students in average daily attendance, hereinafter called ADA. The classroom teachers of the School District in 1970–71 were based on an ADA in 1969–70 of 1562, but for the first eight months of the 1970–71 school year the ADA was 918, a drop of 644 from the previous year. If the State had continued the former practice of basing the number of teachers in a school year on the ADA for the preceding year, the School District would qualify for 24 fewer teachers for the 1971–72 school year. However, the State has changed the rule for the 1971–72 session and for that session the ADA that counts will be that for October and November, 1971. The ADA for October and November, 1971, will be considerably lower than the ADA on which the number of teachers were based for the 1970–71 year because in the 1969–1970 year in which the School District had an ADA of 1562 the School District had more than 1600 students in its schools, whereas in May, 1971, the School District had only approximately 1217 students and there is no reason to think it will have any more during the 1971–72 school year."

the 21 white teachers not returning, 4 retired, 16 left of their own accord, and one was terminated "for cause". Of the 10 blacks not rehired, 3 left voluntarily, but 7 (the 6 named in this suit and one other) were terminated involuntarily or not offered contracts. By utilizing its anticipated quota of 45 teacher units, the district then proceeded to hire 18 new teachers, 6 blacks and 12 whites, who had no prior experience in the system. Some of the newly hired teachers, including two blacks, were assigned to teach the same subject areas as the discharged six teachers had previously taught.

Notwithstanding the loss of 15 teacher units in state funds, the district was able to procure Title I and other funds to hire additional teachers for the 1971–72 school term. In fact, the overall size and racial makeup of faculties remained the same as it had been the previous year. Indeed, all vacancies in the roster were filled by September 1971, when plaintiffs first sought reinstatement of the six by federal injunction. A four-year comparison of size and race of faculties should be noted. During 1969–70, which was the last year of the dual school system, the school district employed a total of 67 classroom teachers, of whom 37 were black and 30 were white.[5] For the 1970–71 school year, which may be regarded as the "base" year, the district had 68 classroom teachers, one-half black and one-half white.[6] For the critical year in question, 1971–72, the classroom teachers remained at 68, again equally divided between the races.[7] For 1972–73 the classroom teachers remained the same in number and race in the various schools.

The plaintiffs contend that the six teachers were entitled to *Singleton's* pro-

tection since the school officials reduced, or were anticipating reducing, the size of the teaching staff while the schools were still in process of desegregation, and the board's failure to utilize objective and reasonable nondiscriminatory standards in dismissing or not rehiring them was both constitutionally impermissible and directly contrary to the court-ordered faculty provisions controlling the Coffeeville Consolidated School District. Plaintiffs further charge that the evidence fails to show that any of the six teachers, concededly members of the pre-order faculty population, was absolutely disqualified for further teaching within the "cause" concept of failing to meet minimum standards of decency, enunciated by *Singleton*.

The defendants deny that *Singleton* is applicable, first claiming that the district schools were not in the process of desegregation in the spring months of 1971, and next contending there was no actual reduction in teaching staff. They further assert that the dismissal of the six black teachers was not racially motivated since the school officials newly hired other black teachers and the racial makeup of each school's faculty, when all vacancies were eventually filled, remained the same. Finally, defendants assert that they, exercising the discretion accorded to them by state law, did not renew the contracts of the six individuals because of absolute disqualifications amounting to just cause, even if judged by *Singleton's* closely drawn requirements.

■ First, we hold that when the defendants did not offer renewal contracts to the six teachers in April 1971, the Coffeeville public schools had not become fully established as a unitary system but

---

5. See defendants' answer to interrogatories filed 1–29–71.

6. Detail of faculty information reported to court 3–12–71:

|  | Black | White |
|---|---|---|
| Coffeeville Elementary School | 13 | 11 |
| Coffeeville High School | 8 | 11 |
| Oakland Elementary | 8 | 7 |
| Oakland Junior High School | 5 | 5 |

7. Faculty information submitted to court 3–9–72:

| | | |
|---|---|---|
| Coffeeville Elementary School | 11 | 12 |
| Coffeeville High School | 12 | 12 |
| Oakland Elementary | 5 | 6 |
| Oakland Junior High School | 6 | 4 |

were still in the process of desegregation. As noted, the 1970–71 scholastic year was the occasion of immediate implementation of two distinct student assignment plans, one for the first semester and a quite different one for the second semester. The entire year was marked by hectic events and upheavals which affected both the City of Coffeeville and its public schools. After the second semester began with a student assignment plan of zoning and pairing, the court had to intervene to protect the positions of three black teachers who were immediately demoted. We are mindful that the Fifth Circuit takes the view that to achieve a unitary system a school district must operate successfully for several years. In Lemon v. Bossier Parish School Board, 444 F.2d 1400 (5 Cir. 1971), the court specifically noted:

> "The Plain Dealing district does not meet this standard since it operated as a unitary system for only one semester. 'One swallow does not make a spring'."

Thus, with the Coffeeville district, we may conclude only that desegregation had not been completely achieved, and the schools were still in process of implementing the desegregation orders of this court. Thompson v. Madison County Board of Education, 476 F.2d 676 (5 Cir. 1973). In view of these plain facts, it would be an abuse of discretion to hold otherwise.

Next, we determine that this is a reduction case within the meaning of *Singleton*. It is patently clear that the initial decision not to hire the six teachers was induced, at least in substantial part, by the realization that the loss of students, as reflected by the reduced ADA, necessitated a reduction in teaching staff. The only uncertainty which confronted the school officials in April–May, 1971, was the extent of the reduction. This loss was directly attributable to the vicissitudes of desegregation in this particular school district. As matters finally turned out, the reduction in staff was more fancied than real. As we have seen, this was due to a combination of

circumstances: the change in statutory formula and subsequent ADA buildup, a greater number of voluntary terminations by teachers than anticipated, and the procuring of additional school funds. Even so, the decision not to offer new contracts to the six teachers was initiated in the belief that it was necessary to reduce the size of the teaching staff; and at no time did the defendants consider recalling the six non-hired teachers when these later developments occurred.

Because of these two factors—a school district in process of desegregation and an anticipated reduction in faculty—the Coffeeville district was bound by *Singleton's* stringent requirements in determining which teachers should be dismissed or not rehired. Indeed, it was under an explicit order to so act (n. 1). Concededly the board did not do so, for it failed to develop nonracial objective criteria to be used in selecting teachers to be dismissed; instead, it sought to rely upon the type of subjective evaluation which federal decisions do not countenance. United States v. Texas Education Agency, 459 F.2d 600 (5 Cir. 1972); McLaurin v. Columbia Municipal Separate School District, 478 F.2d 348 (5 Cir. 1973), en banc hearing pending.

It is no answer for the board to assert a generality that the dismissals were not racially motivated since it hired other black teachers to replace black teachers who were not rehired, or that when the faculty roster was completed, it had virtually the same racial makeup as before. This argument entirely overlooks the constitutional rights which *Singleton* accords to *individual teachers* who were members of the teaching staff at the time of court-ordered desegregation, were presumably qualified to continue teaching, and could not be lawfully dismissed except in accordance with objective and reasonable nondiscriminatory criteria applied alike to all teachers in the system.

Our conclusion is indeed mandated by the Fifth Circuit's reasoning in Lee v. Macon County Board of Education, 453 F.2d 1104 (5 Cir. 1971), where the court

ruled that the failure of the Muscle Shoals, Alabama school district to continue a black principal in office was constitutionally impermissible in the absence of objective criteria. In that case, Circuit Judge Goldberg, at pp. 1110–1111, said:

"It is not enough to assert that a principal hired from without the preorder population is 'more' qualified than a member of the population of demoted principals or teachers, for acceptance of that assertion would make illusory the constitutional presumption that this court erected in *Singleton*. The per se presumption of Singleton with regard to qualifications was erected to assure compliance with the Fourteenth Amendment in all phases of the desegregation process. In order to establish that a former principal was not 'qualified', and therefore not within the protective penumbra of *Singleton*, a school board would have to establish the principal's lack of 'qualification' by means of objective and absolute criteria, not by means of comparison with another applicant or by means of administrative institution. The board must show the former principal to be independently unqualified to assume the new opening. And in order to fulfill that burden the board would have to establish quite clearly why one who was qualified prior to a desegregation order suddenly became unqualified after the order.

\* \* \* \* \* \*

"*Singleton* obviously does not protect every Alabama citizen who might conceivably be qualified for a principalship under the Alabama statutes. *Singleton* addresses itself only to those Alabama citizens who held principalships prior to a desegregation order and whose qualifications have not deteriorated in an absolute and objective sense since the issuance of the order and the resulting demotion or dismissal."

■ As applied to the case at bar, *Singleton*. clearly means that the six black teachers for whom this suit is brought were entitled in April 1971 to constitutional protection against involuntary dismissal save by specific standards placed upon defendants, but which they did not observe. Finally, the point that the defendants complied with that provision of this court's order which contemplated the employment of substantially an equal number of white and black teachers on each school faculty may not relieve them of the further duty, in case of reduction of staff, to make certain that individual teachers not being rehired would be constitutionally dismissed. As the *Lee* case makes clear, school officials are not permitted the choice, where reduction in teaching staff occurs during the process of desegregation, to hire other teachers thought more worthy or qualified to take the place of those already employed. As we perceive *Singleton's* teaching, this stricture obtains, irrespective of whether the race of the non-hired teacher is the same as, or different from, that of the newly hired teacher.

This leaves for our final inquiry whether the discharge of the six teachers, or any of them, may be upheld on the basis of "just cause", without reference to pre-established objective and racially nondiscriminatory standards. The applicable yardstick was lucidly stated by Circuit Judge Dyer in the recent decision of Thompson v. Madison County, supra, 476 F.2d at p. 678:

" '[J]ust cause' in a *Singleton* situation does not refer to a teacher's lack of professional credentials, his poor performance in the classroom, his failure to abide by school regulations, his lack of cooperation, or other similar explanations. These types of reasons for discharge fall directly within the scope of *Singleton*, and accordingly such discharges must be justified on the basis of objective and reasonable standards for dismissal previously set by the school board. If this kind of a discharge can be justified in terms of the established objective standards, it is not for 'just cause'; it is simply a discharge in compliance with *Single-*

*ton* criteria. 'Just cause' in a Singleton situation means types of conduct that are repulsive to the minimum standards of decency—such as honesty and integrity—required by virtually all employers of their employees, and especially required of public servants such as school teachers. No pre-established objective criteria are necessary to justify the discharge of a teacher whose conduct does not measure up to these minimum standards of behavior. For example, if a teacher came to school drunk, or was found stealing from the school treasury, or sexually assaulted a student, the school board could substantiate on 'just cause' grounds its firing of that teacher, even though the school system was still in the process of desegregation and whether or not the school board had established any *Singleton* criteria for discharge or demotion."

Our task is to evaluate whether "just cause" in a *Singleton* situation, in terms employed by Judge Dyer, does or does not exist with respect to each of the six named teachers. None of them, except in the case of Alice Faye Chapman,[8] was recommended for rehire by his or her principal. The superintendent assigned various reasons for dismissal in addition to the common ground of staff reduction (n. 4), thus necessitating a separate review of each teacher's case to determine the propriety of dismissal.

## I. ALMA FAYE CHAPMAN

█ This teacher, who held a BS degree from Mississippi Industrial College and an "A" teaching certificate, had been employed in the Coffeeville schools for two years. She taught 7th, 8th, 9th and 10th grade classes in mathematics, algebra and spelling. On April 26, 1971, she was notified by Superintendent Denley that, despite her principal's recommendation, she would not be rehired because of a complaint received regarding a classroom discussion on homosexuality. That day the teacher submitted a letter of resignation, which she subsequently withdrew, claiming that her resignation was not voluntary but pressured by Mr. Denley.

The incident alluded to occurred during the first semester in an 8th grade class of 13–15 year old boys, at a time when the students were studying their spelling lesson. One of the boys asked Ms. Chapman: "What is a queer?" She admonished him to be quiet but he persisted, saying that certain male teachers at the school were reported to be "queers". Other boys joined in to press the inquiry, and the teacher entered upon a discussion of homosexuality. The credible evidence is that the teacher did not use foul words but discussed sex deviants in general terms, without reference to personal experience. Certain parents objected to this sort of discussion, which the teacher defended as proper under the circumstances. The subject did not come up again in class. While the judgment of a woman teacher discussing the subject at all with young boys might be questioned, her doing so was certainly not an act "repulsive to the minimum standards of decency" required of public school teachers. This single incident arising under the detailed circumstances certainly cannot serve to convict the teacher of misconduct to disqualify her from continued employment. The board's finding that she thus became disqualified is not supported by substantial evidence. Other charges against Ms. Chapman related to her failure to abide by school regulations in giving on one occasion an oral rather than a written examination and in handing out inconsistent grades to some students. Although supported by credible evidence, these grounds constitute reasons which are plainly insufficient to discharge a *Singleton*-protected teacher.

---

8. Ms. Moorman, the principal who recommended Ms. Chapman, later testified her recommendation would not have been made if she had known about the teacher's inaccurate grading of certain students.

## II. EVELYN R. MILLER

■ This teacher held a BS degree from Alabama State Teachers College; she was qualified to teach elementary grades, and had taught in the Coffeeville schools for 13 years. During the 1970–71 school year she taught remedial language classes under Paul Pittman, principal, and Ms. Lila H. Hull, supervisor. She was not recommended by these superiors because they regarded her to be inattentive and incompetent as a classroom teacher. They were both of the view that she was not industrious, failed to give adequate individual attention to her students, and inefficiently performed as an instructor in her classes. The evidence against this teacher does not rise above the level of mere incompetence, which the defendants could not use as a basis of dismissal because of their failure to develop objective and reasonable nondiscriminatory standards. While there was testimony that in several cases Ms. Miller may have excessively disciplined students in her classroom rather than sending them to the principal's office as directed by the handbook, she was never reprimanded for the disciplinary methods she employed. It was not shown how after many years of teaching, she became absolutely disqualified for further teaching. On the basis of the record made before the school board as well as this court, there is no evidence to justify the summary dismissal of this veteran teacher in violation of *Singleton*-mandated standards. We deem it wholly irrelevant to discuss plaintiffs' claims that Ms. Miller was, in actuality, not rehired because of the activity of her husband as a civil rights leader in support of the boycott by some black citizens of the public schools and white merchants, an assertion that was stoutly denied by Superintendent Denley.

## III. ROBERT BENNETT

■ This teacher was a graduate of Jackson State College, where he received a BS degree in physical education. He was first employed by the Coffeeville school district in September 1969, to teach 7th and 8th grade science and health classes and be the head basketball coach. During the 1970–71 term, he served under Principal Pittman with Allan Parker and Harold Jones as his supervisors. During the first portion of the school term he was demoted to a physical education teacher for 2nd through 6th grade boys; in February 1971 this court ordered him reinstated to his coaching duties on a finding of racial discrimination.

The superintendent's notice specified various charges against this teacher. Many of them are of an administrative nature, such as overly strict grading, allowing students to use the gymnasium after school hours, and not complying with the handbook in administering corporal punishment. On several occasions, he disciplined students by paddling them in front of the gymnasium class rather than sending them to the principal's office where paddling was permissible under the school's regulations. In two instances, he caused adhesive tape to be placed over the mouth of a student who was unduly boisterous in class, Bennett affirming that he did this, in part, to demonstrate first aid in case of a busted lip but also to quiet the student for a brief period. On another occasion he failed to return a knife borrowed from a student until there was parental intervention; and other parents objected, on religious grounds, to Bennett's institution of a dance program in physical education classes. Bennett had logical explanations for these actions thus questioned, and his testimony was not refuted by substantial evidence. Moreover, the claims specified in the hearing notice as to an alleged assault and battery against students and carrying a pistol in his automobile were entirely unsupported by evidence.[9] Without doubt, his superiors

---

9. On the school board's motion, the court later received evidence relating to Bennett's conviction for assault and battery upon a student in a justice of the peace court, which conviction was set aside and nol-prossed on appeal. The incident upon which the prosecu-

were, in view of the tension prevailing in the community, critical of his judgment in placing a bumper sticker on his automobile, which he customarily brought to school, which read "IF AT FIRST YOU DON'T SUCCEED, TRY A–GUN". Bennett defended the sign as a play on words of the well-known adage ending with the phrase "try again". Manifestly, there was no evidence whatever that Bennett engaged in violence, or that he advocated violence in dealing with others, or that he was guilty of misconduct toward anyone. Assuredly, his active support of the boycott and his criticism of a desegregation plan which assigned boys and girls to separate schools does not, without more, amount to absolute disqualification. We reach this conclusion after giving full weight to all of the evidence submitted before the board as well as this court and conclude notwithstanding the board's contrary decision, that "cause" in the *Singleton* concept did not exist for not rehiring this teacher.

### IV.  JAMES LEWIS

■  This teacher had a BS degree from Alcorn A & M, with 9 hours of advanced study. First employed by the Coffeeville schools in July 1969, he taught vocational agriculture and was also qualified to teach shop courses. The evidence against him related to charges as follows:

(a) Failure to remain in shop classes at all times while his high school students were at work.

(b) Failure to keep close check on shop equipment, thus allowing some tools to disappear.

(c) Taking two days' time in class to fill out income tax forms for others instead of doing classwork.

(d) Allowing the shop premises to be used by unauthorized persons.

(e) Refusing to build shelves when requested by a superior.

(f) Showing partiality to black students.

(g) An inability on one occasion to enforce discipline in a class, causing the principal to intervene to restore order.

Lewis stoutly denied the charges that he neglected his students or classwork, that he allowed persons not connected with the school to enter the shop, or that he was in any way responsible for certain missing items of tools and equipment. The evidence against him was insubstantial and unpersuasive; and if accepted as correct, cannot be justly regarded as grounds for absolute disqualification. Since the district did not choose to adopt and be controlled by objective and reasonably nondiscriminatory criteria, we conclude that the dismissal of this teacher was without case.

### V.  MARTHA FAYE BOLTON

■  This teacher was employed as an elementary physical education teacher with two years experience in the school district. During the 1971–72 school year she was employed at Oakland Elementary School under the direction of Principal Buford C. Sellers and physical education supervisor Allan Parker. Neither of these administrators recommended Ms. Bolton for reemployment. The serious charge leveled against her, which was amply supported by credible evidence, was that Ms. Bolton was perennially tardy in arriving at school on mornings 10 to 15 minutes late no less than 146 times out of 176 teaching days. Notwithstanding the principal's several reprimands for her tardiness, this teacher persisted in being late for her classes. Apart from the poor effect on her students, this lack of punctuality was a demoralizing influence with other teachers who witnessed her obstinacy in

---

tion was based involved Bennett paddling second grade boys with a ping pong paddle because of their unruly conduct in a gym class. This mild punishment consisted of no more than several licks across the backside and did not exceed the bounds of reasonable discipline.

Although Bennett violated the school regulation by paddling the students in class and not in the principal's office, this would not constitute justification for discharging a Singleton-protected teacher.

refusing to obey the principal's directions. Ms. Bolton's faint denial of perennial tardiness cannot be accepted against overwhelming evidence to the contrary; nor did she advance a defense that perennial tardiness had been tolerated or acquiesced in by school officials prior to the desegregation order.

It is essential to school operations that school teachers timely arrive at their station of duty to discharge the duties which they contract to perform. While occasional tardiness might be understandable, a long-continued, inexcusable practice of tardiness does not comport with minimum standards of decent conduct required of an employee. An employer has the right to expect honesty and faithfulness from employees in meeting their obligations for observing the established hours of work. Where such honesty is not at all observed, it is, in our opinion, a basis of absolute disqualification of a teacher otherwise falling within the scope of *Singleton*. Since we hold that the record supports a discharge of Ms. Bolton because of her obdurate and inexcusable tardiness in reporting to school, it is unnecessary to consider and weigh the evidence relating to other charges as to her inability to properly discipline students and also for punishing certain students in a manner contrary to what school regulations provided.

## VI. WILLIAM SHELTON

This teacher, a 1968 graduate of Mississippi Industrial College, majored in elementary education, and had taught three years in the Coffeeville system. The first two years he had junior high language courses and was recommended for rehire by a black principal. He began the 1970–71 year teaching history and science but after two months was transferred to remedial language classes for the balance of the school year, serving under Mr. Pittman as principal and Ms. Hull as supervisor. Although both superiors rated Shelton competent in subject-matter knowledge, they did not recommend him for reemployment because they thought he was otherwise unqualified, and guilty of conduct which seriously breached important school policies and regulations. A variety of reasons was given by the superintendent to support the dismissal, and extensive evidence was offered in support of the charges. It was Shelton's belief that he was not rehired merely because he openly supported the organized boycott, participated in protest marches and attended civil rights meetings in the black community. To reach that conclusion, however, one would have to ignore certain important facts established by the evidence.

■ We feel that only two of the various reasons assigned against Shelton are of such serious nature as to constitute a basis of absolute disqualification, and merit discussion. These matters relate to Shelton's considerable absenteeism from school and his bizarre and sadistic methods of student discipline.

Shelton was absent from school no less than 20 school days, or 10% of the entire school year. Sick leave accounted for only 3 days; and 10 days he took off because of what he deemed to be emergency situations. When his brother was accidentally injured in a distant city he was absent 3 days; when four relatives —an aunt, uncle and first cousins—were killed in a single automobile accident, he was away 7 days. He was absent 7 days more without apparent reason. On four occasions, the principal was unable to procure a substitute teacher, because of Shelton's failure to give advance and timely notice of an intended absence. On two other occasions, his supervisor was forced at the last moment to take over his classes. Unreasonable burdens were thus put upon the school's teaching staff, and special instructional problems for students arose directly because of Shelton's absenteeism. These absences were, for the most part, unexcused and they persisted throughout the school year. An employer is entitled to expect greater fidelity to the job than was exhibited by Shelton, after making reasonable allowance for emergency situations.

As for his disciplinary procedures, Shelton employed highly questionable and demeaning methods in his classroom, which were carried out without the principal's knowledge or approval. Punishments meted out in a 5th grade boys' class were as follows:

(a) When he was unable to get the attention of certain students, although it was a warm day, Shelton closed the classroom doors, pulled down all windows and shades and cut off the lights, leaving the entire class in semi-darkness for a thirty-minute period. Many students complained of the physical discomfort thereby generated.

(b) On 5 or 6 different occasions, the teacher attempted to discipline certain students, and once the entire class, by making pupils stand against a concrete wall and press full body weight against their knuckles upon rough, cracked edges of the concrete. This produced a significant measure of pain to students thus punished after the lapse of a few minutes.

(c) Other misbehaving students were punished by having books placed on outstretched arms, and Shelton required them to do knee bends. Some of the pupils fell on the floor in performing this manoeuver.

(d) The teacher also had a practice of administering punishment to unruly students by "thumping" their head as if testing a watermelon, and also by cracking their knuckles with a ruler or pencil.

Parental objection was registered to the foregoing practices, and Superintendent Denley issued a reprimand to Shelton, advising him that he would discharge him at once "if he were a white man". Shelton then discontinued his punishment methods, yet persisted in believing that his special disciplinary problems were caused by white students whose parents objected to his stand on civil rights.

While certain credibility issues are raised by the evidence, this teacher demonstrated qualities or characteristics which do amount to misconduct, or a basis of independent disqualification, apart from a general claim of incompetence or other ground of racial discrimination. This court thus concludes that the board's decision not to reinstate Shelton is fairly supported by substantial evidence of such independent disqualification. Where the school board procedure "is conducted in accordance with the dictates of procedural due process"—which was true here—its finding "is entitled to great weight and substantial evidence appears to support the school board action that ordinarily ends the matter." Thompson v. Madison County Board of Education, supra; Green v. Board of Regents of Texas Tech Univ., 474 F.2d 594 (5 Cir. 1973).

Finding that Alma Faye Chapman, Evelyn R. Miller, Robert Bennett and James Lewis have been improperly discharged, contrary to *Singleton* requirements, we hold they are entitled to reinstatement and award of back pay, less credits for earnings received in other employment during the period of discharge. In addition, plaintiffs are entitled to recover a reasonable attorney's fee for services rendered on behalf of these four teachers, as the court finds that there are no special circumstances that render such an award unjust for these services rendered since July 1, 1972, the date of § 718 of the Education Amendments Act of 1972, and for prior services because the board's actions were carried out in an unreasonable and obdurately obstinate manner by a flagrant failure to prescribe *Singleton* standards. No consideration, however, may be given to counsel's services on behalf of Martha Faye Bolton and William Shelton, whose dismissals we uphold.

An order shall be entered accordingly.