Robert Clark **KEGLAR** and Elbert S. Burten, Plaintiffs,

v.

**EAST TALLAHATCHIE SCHOOL DISTRICT et al., Defendants.**

No. DC 73–82–K.

United States District Court,
N. D. Mississippi,
Delta Division.

July 22, 1974.

Leslie D. King, Greenville, Miss., for plaintiffs.

George P. Cossar, Jr., Charleston, Miss., Ed Davis Noble, Jr., Asst. Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this teacher reinstatement suit brought by two black plaintiffs, the primary question for decision is whether the "process of desegregation" had effectually ended in the public schools of the East Tallahatchie School District when plaintiffs, admittedly faculty members at the time of the desegregation order entered pursuant to *Singleton*,[1] were not rehired. Two subsidiary issues, assuming *Singleton's* applicability, relate to the correlative duties imposed by *Singleton* on a school board which fails to rehire one teacher and on another teacher who fails to make timely application for reemployment.

Robert Clark Keglar (Keglar) and Elbert S. Burten (Burten) were classroom teachers employed on July 31, 1970, by East Tallahatchie School District (School District) when this court entered a comprehensive desegregation order,[2] establishing zones for attendance

---

1. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5 Cir. 1970), cert. denied, 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530.

2. United States v. East Tallahatchie School District, No. WC 70–36–K (N.D.Miss.)

centers for grades 1–6, with 2-grade pairing at three separate buildings, and assigning grades 9–12 for certain courses taught only at the former Allen Carver High School (black) and for other courses given only at former East Tallahatchie High School (white). By this unique plan of desegregation, entered upon consent order with approval of the Department of Justice and the U. S. Office of Education, students both at elementary and secondary levels were freely transferred by school busses to the several school campuses utilized under the assignment plan. After one year's experience with this arrangement, the School District and the Department of Justice presented the court with a modified student assignment plan, effective for the 1971–72 school year, whereby the first three grades were assigned to Charleston Elementary School, grades 4–9 to Allen Carver and grades 10–12 to East Tallahatchie High School. The original desegregation order, respecting faculty, contained *Singleton's* terms and provisions, the pertinent portions being quoted below.[3]

Keglar's position was exclusively as a driver education instructor in the high school. Although certified in elementary education, Keglar last taught academic subjects in 1965; even before the advent of desegregation, this teacher gave instruction only in driver education at Allen Carver. He continued to perform his duties as driver instructor, without any complaint or criticism, for the school years 1970–71 and 1971–72. At the end of that period he was not rehired. Burten, the holder of a master's degree, had been employed for five years as a social studies teacher in the school system. He taught three years in the Allen Carver High School, and the last two years he was assigned to Charleston High School. No question or criticism arose concerning this teacher's performance, yet he was not rehired at the close of the 1971–72 school year.

The record shows, without dispute, that following the initial order of desegregation, there was considerable unrest among black students, which in October 1970 culminated in an organized boycott supported by approximately 300 students. Various grievances, and charges modified assignment plan in September by the students and their supporters in the black community. The protest activities interfered with the school operations to the degree that the school offi-

---

3. "1. The principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. For the year 1970–71, the district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system.

. . . . .

"2. Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin, except to the extent necessary to correct discrimination.

"3. *If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district.* In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, *until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.*

"Prior to such a reduction, the school board will develop or require the development of non-racial objective criteria to be used in selecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee." (Emphasis added).

cials had to resort to a judge of this court in late October 1970 for a restraining order prohibiting demonstrating blacks from interfering with the orderly operation of the schools. School enrollment was further adversely affected by the withdrawal of approximately 100 whites disenchanted with public school desegregation. The evidence fails to disclose when the boycotting blacks returned to school. It is evident, however, that after the institution of the modified assignment plan in September 1971, black opposition to desegregation largely disappeared. During the 1970–71 school year, the enrollment attrition was so serious that the School District, by March 1971, was faced with prospective loss of 16 or 17 teacher units. However, with gradual improvement in enrollment in the last school months, and also with the 1971 change in state statute,[4] the district was able to obtain adequate financing and thus avoid an immediate reduction in teaching staff. Nevertheless, in March 1971, the district, anticipating the probable necessity for reducing the teaching staff, adopted written criteria for the dismissal of teachers. The School District's statement of dismissal policy was submitted to, and received the approval of, both Department of Justice and HEW officials; it was widely publicized among the faculty and available for public inspection. This policy specified criteria of dismissal of teachers because of loss of ADA teacher units, according to the following priority:

"a. [T]eachers last employed in any nonacademic subjects at the school that is effected by the ADA loss shall be the first teachers dismissed.

"b. [T]eachers last employed in the academic area *of the effected school* shall be the next teachers dismissed." (Emphasis added).[5]

It was not until the following year, in the spring of 1972, that the district, because of a reduced quota of teaching units under the revised ADA formula, had to reduce the teaching staff. Although certain teachers voluntarily retired or left the system, three more had to be dismissed, to meet the ADA formula. The district resorted to the previously adopted dismissal criteria to determine who should not be rehired for the next year. The district first determined that Keglar, the sole instructor of driver eduction, a course affecting the least number of students and by school trustees considered the most expendable, should not be rehired, and the subject no longer offered. No driver education courses have since been offered. The district decided that other non-academic subjects like band, athletics, and physical education should be continued for the school's benefit, and the district dismissed no other non-academic teachers. Thus, Keglar, alone, was dismissed under (a). Burten and a Mr. Smitz (white), both high school social studies teachers, were next dismissed under (b) because they were teachers last employed in academic subjects at Charleston High School, which was the school sustaining the greatest loss of students. Although these factors were indisputably true, Burten had greater seniority as a social studies teacher than did several rehired teachers in the middle school serving grades which Burten was also certified to teach.

When notified by their school principal in early April 1972 that they would

4. By Mississippi law, state-aid for teachers' compensation to local school districts was in accordance with a formula of 1 teacher for every 27 students (ADA) for the *previous* school year. This statute, by Chap. 363, Laws of 1971, was amended to allow school districts to obtain teacher units based upon the second and third months' ADA of the 1971–72 school year. Miss.Code 1972 § 37–19–5(1). This change of statutory formula

for determining ADA, and its ameliorative effect on a school district in the throes of desegregation, were explained by this court in United States v. Coffeeville Consolidated School District, 365 F.Supp. 990, 994 (N.D. Miss.1973).

5. The policy of Dismissal Criteria in its entirety is appended as an exhibit to this opinion.

not be rehired, plaintiffs sought meetings first with the superintendent and then before the School Board. These meetings were arranged without delay; at his conference, Superintendent Alderman, and later the Board, at a convened meeting, advised plaintiffs of the reason that they (along with Smitz) were not to be rehired and that the action was taken in accordance with objective criteria set forth in its policy to reduce the faculty by three.[6] The board meeting, without doubt, was fairly conducted; and no one raised any question regarding the competence or qualification of either plaintiff. Upon being informed of the decision, both plaintiffs were advised, in the same open meeting, that they might file applications for other teaching positions, which would be favorably considered in the event of vacancies later developing within the system. Keglar, though advising the board that he was qualified to teach in elementary school, having once taught elementary academic subjects, thereafter failed to apply for a position with any of the district's school principals or Superintendent Alderman. At trial, Keglar admitted that he did not apply, but insisted that no one ever told him that he should apply for another position with the East Tallahatchie public schools. The court rejects this explanation as incredible, holding that Keglar's failure to apply was attributable either to indifference or a desire to become more active in farming and aiding his wife in operating a local cafe. Keglar had carried on these nonteaching pursuits while employed by the district, and since his dismissal has engaged in them full-time.[7]

Burten, on the other hand, after the school board meeting, did apply for an elementary teaching position. In late June 1972 a vacancy in his field developed, when a teacher in the middle school decided to quit. This vacancy was filled by a white teacher newly hired outside the system. The school district made no effort to offer Burten the job or to ascertain his interest in the teaching opportunity. The reason assigned by Superintendent Alderman for his admitted failure to contact Burten was his testimony that he had been earlier contacted by West Tallahatchie school officials interested in hiring Burten, that he had recommended Burten to those school officials for employment, and thus considered that it would be a breach of school ethics to approach Burten with a job offer. The evidence fails to disclose exactly when Burten first applied for the West Tallahatchie teaching position, or when he was first notified that he had been firmly employed in the West Tallahatchie schools for the 1972–73 school year.[8] Unaware of the vacancy occurring at the Charleston middle school, Burten proceeded to accept the West Tallahatchie offer and has since remained a member of that school district's faculty. Although his new employment is at a salary greater than he received from the defendant School District, Burten feels aggrieved, principally because his place of residence is at Charleston and he is required to report at Sumner, 22 miles distant, to perform

---

6. Keglar also notified the Department of Justice, which investigated the dismissal complaint but took no action.

7. The court also rejects as wholly unsupported by evidence Keglar's opinion that he was, in actuality, dismissed because of his political activities with the Democratic Party in voter registration and education drives, his holding office as Vice President of the local chapter of NAACP, and because of his mother's long record of NAACP activity in the Charleston area. Keglar presented no evidence whatever to substantiate these insinuations. The whole record refutes any notion that the school officials, when Keglar was not rehired, acted with such motivations.

8. By our direction, the clerk of court has ascertained from West Tallahatchie school officials that their records reflect that Burten applied to them in writing for a teaching position on August 15, 1972, he was on September 8, 1972, elected by the West Tallahatchie District as a social studies teacher, and that the signed contract of employment on file bears no date. It is, of course, highly probable that oral negotiations between Burten and West Tallahatchie school officials began somewhat earlier than August 15.

teaching assignments at the West Talla-hatchie school. It should be noted that the present federal action was instituted July 12, 1973, after Burten had complet-ed his one-year contract of employment with West Tallahatchie. When this case was tried on June 7, 1974, it was dis-closed that Burten had also taught for a second year for West Tallahatchie school. Although the superintendent af-firmed that no teacher vacancies at present exist for the forthcoming school term, the district has each year hired teachers new to the system, and has maintained a fairly constant ratio of black and white professional staff in all schools.

### Had The Process of Desegregation Terminated At Time of Failure To Rehire?

Defense counsel vigorously urges that the process of desegregating the East Tallahatchie schools had been effectively completed by the spring of 1972 so that the School District was no longer sub-ject to *Singleton's* stringent require-ments in regard to teacher dismissal. It is contended that, following the court's July 1970 desegregation order, the dis-trict's schools immediately commenced operating as a unitary system with inte-grated student bodies, faculty, transpor-tation, activities and services at all at-tendance centers, and such massive de-segregation continued uninterruptedly for two full school years before the dis-trict decided not to rehire plaintiffs. Defendants suggest that we consider the boycott by blacks and withdrawals by whites as events unrelated to the man-dated process of desegregation, and they stress that even with a reduced ADA and fewer students during this two-year period, no demotion or dismissal of any member of the teaching staff, black or white, occurred.

Defendants' contentions, although su-perficially plausible, cannot be accepted as sound. In the first place, this case is unquestionably one of faculty reduction, despite the fact that the necessity for reduction, because of a combination of fortuitous circumstances, was postponed for nearly two years following the de-segregation order. In the second place, the reduction was solely caused by loss of student enrollment on account of the exigencies of operating a desegregated school system, i. e., boycott by protesting blacks and permanent withdrawal by whites electing to attend private schools. These factors surely make *Singleton's* employment requirements imperative un-less it can be said that the school dis-trict, when deciding not to rehire the plaintiffs, had already completed the process of desegregation and effectively established a unitary school system. Defendants assert that two-years operat-ing experience after the entry of a com-prehensive desegregation court order is enough to demonstrate that the process of desegregation has come to an end. In the case sub judice, this argument miss-es the mark and also proves too much. For, it ignores the occurrence of trau-matic and hectic events attending public school desegregation a substantial por-tion of the first year and the inevitable faculty reduction which had to be accom-plished at the close of the second year. Moreover, if defendants are correct, they would have had no need to resort to utilizing objective criteria in the dismis-sal of any teacher, though the district felt bound to do so, but possessed the power, if *Singleton* did not apply, of ex-ercising the "discretionary right of local school authorities in Mississippi to su-pervise the conduct of their teachers and refuse to renew their contracts." Cir-cuit Judge Dyer, in dissenting opinion, McLaurin v. Columbia Municipal School District, 478 F.2d 348, 356 (5 Cir. 1973).

We are instructed that Singleton be-comes inapplicable "only when 'full com-pliance with the desegregation directives of this court' is achieved", Thompson v. Madison County Board of Education, 496 F.2d 682, at 687 (5 Cir., 1974). Re-cently, the Fifth Circuit admonished that the process of desegregation does not occur merely upon the entry of a court order. "If the journey from

*Brown* to *Swann* [Swann v. Charlotte-Mecklenberg Bd. of Ed., 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] and beyond has taught us anything, it is that desegregation does not occur merely when and because we say it should. The journey has been necessary because we have been concerned with conduct and action, not words." *Thompson,* supra.

■ Even so, we do agree that the duration of time during which a school district operates effectively, after commencing full desegregation, and absent special, complicating circumstances, is, and ought to be, very material to the factual and legal determination as to when the process of desegregation is at an end, and *Singleton's* strictures in dismissal of teachers are no longer binding on a school district. The simple question is, just how long does it take to establish a unitary school system? District courts have been bluntly told that it takes more than a desegregation order to produce unitary schools, but surely the time span need not be, as some maintain, an indeterminate number of years, even extending beyond the present generation. Courts have not heretofore established hard and fast rules for measuring the length of time necessary for just determination. The most direct expression by the Fifth Circuit appears in Lemon v. Bossier Parish School Board, 444 F.2d 1400 (1971). A panel composed of Circuit Judges Gewin, Goldberg and Dyer articulated a sensible, persuasive standard in a case considering the permissibility of assigning students to schools within a district solely on the basis of achievement scores after the schools had operated as a unitary system only for one semester. Holding that the school board had not operated for a sufficient time to raise the issue it sought to present, the Fifth Circuit held: "We think at a minimum this means that the district in question must have *for several years* operated as a unitary system." (Emphasis added). By

definition and common understanding, the word "several" has more than a single connotation of diverseness; it may denote more than one, or an indefinite number, more than two and fewer than many. Webster's Third New International Dictionary.

■ This court applied *Lemon's* standard in United States v. Coffeeville Consolidated School District, 365 F. Supp. 990, to hold a school district was still in the process of desegregation one year after the public schools began to operate as a unitary system. Indeed, *Coffeeville,* supra, though different in certain material respects, is, we think, legally indistinguishable with respect to the durational period under critical study. We hold that two years, where marked by hectic school and community upheaval and delayed faculty reduction, was not adequate time to remove the East Tallahatchie teachers from the umbrella of *Singleton's* protection. The uncontradicted facts disclosed by the present record allow us no room to conclude otherwise.

### Correlative Duties on School Board And Teachers Under Singleton's Dismissal Formula

■ East Tallahatchie school officials, in faithful compliance with this court's order (Fn. 3), adopted objective and reasonable nondiscriminatory standards by which to select professional staff for dismissal in event of reduction.[9] Save in one particular hereinafter noted, we find that the School District's dismissal criteria were objective, reasonable and nondiscriminatory standards satisfying *Singleton's* mandate, and also that the School District acted permissibly in establishing two classes of priority for teacher dismissals, viz: first, nonacademic. teachers, and next, academic teachers with the least tenure. Certainly, the district acted rationally in deciding to discontinue driver education, thereby eliminating

9. In this important respect, the present case is unlike *Coffeeville,* where the school board resorted to impermissible subjective criteria.

one teaching position which would do the least damage to the high school circulum. The decision to eliminate the course and not rehire Keglar was reasonable and untainted by racial consideration or improper motive. Keglar was granted a fair due-process hearing, and lawfully dismissed or not rehired; and, although *Singleton*-protected, he was without right to continued employment unless a vacancy might develop in an academic field which he was qualified to teach. Even so, Keglar was under a continuing duty, if he wished further employment, to timely apply for an academic teaching position in the elementary or middle school, but that he admittedly failed to do. He was told he should so apply, subject to the unknown contingency. Having slept on his rights as a *Singleton*-protected teacher, Keglar is now barred from invoking judicial relief.

Keglar's reliance upon Lee v. Macon County Board of Education, 453 F.2d 1104 (5 Cir. 1971), is misplaced, for in *Lee,* Charles Carter, the black principal who was displaced in the desegregation process, was not offered a principalship at the Avalon middle school even though he several times requested the job whenever it became vacant and the school board consistently filled the job with a white applicant new to the system. Here, we emphasize that Keglar at no time prior to suit made application for further employment with East Tallahatchie schools.

A case closely in point, upon which we rely, is Thomas v. Board of Plum Bayou-Tucker School District No. 1, 457 F. 2d 1268 (8 Cir. 1972), where the Eighth Circuit, applying *Singleton's* rationale, upheld the district court's refusal to reinstate Mrs. Lois Thomas, a black teacher employed at the time of the desegregation order and subsequently dismissed. In *Thomas,* this teacher was not considered for a vacancy because of her failure to have a timely application on file and because she did not apply for

the position until after it had been filled.

In a recent case, United States v. Nettleton Line Consolidated School District, No. EC 69–63–K, unreported opinion, we applied *Thomas* in refusing to order relief against a school board for not promoting Boyce Grayson, a black qualified grade school principal, to whom we extended *Singleton* protection, on a finding that Grayson did not apply for the position of high school principal when it became vacant and was subsequently filled by a white applicant newly hired to the school system. In *Nettleton,* the overwhelming evidence was that the school board, as was true with East Tallahatchie, was not racially motivated and had maintained a fairly constant ratio of white and black faculty members since the commencement of a unitary school operation.

■ Burten's case is quite different. We have no quarrel with the School District providing as a second priority of dismissal category (b), i. e., teachers last employed in academic subjects. This formula is certainly objective and nondiscriminatory. The only difficulty is that the School District's formula restricted its application to the staff at "the affected school", meaning Charleston High School, and was not directed at "all the staff of the school district", as provided by *Singleton* and our own order. Obviously, the conflict between these two provisions produces contradictory results, for while Burten and another were social studies teachers with the shortest tenure at Charleston High School, they had more seniority than several social studies instructors retained in the lower grades. No effort was made to compare the length of employment of all social studies teachers in the system, and then dismiss the two having the least tenure. It is our understanding that *Singleton* requires a system-wide, and not a single-school, comparative analysis.[10]

10. *Coffeeville*, 365 F.Supp. at 994: "Moreover, no effort was made to coordinate . . . evaluations made by the different principals and supervisors to determine the ranking of teachers in the system as a whole."

The deviation noted above does not stand as the only, or possibly most serious, omission of the district's legal responsibility to Burten. For when Burten was told that he might apply for another teaching position, he promptly did so; as a result he continued to enjoy *Singleton's* special protection in case of later vacancy in the same year. When this occurred, Burten, the displaced staff member qualified to teach social studies in the elementary and middle schools, was entitled to be offered the job before the district might lawfully deal with a white teacher newly hired in the system.

This plain violation of Burten's constitutional right to continued employment may not be justified or excused by Superintendent Alderman's feeling that he was bound by school ethics not to approach Burten after making a favorable recommendation for his employment to the West Tallahatchie schools. The affirmative duty upon the School District could have been satisfied by nothing less than an unconditional job offer to Burten; and had Burten then declined the position, his case would be at an end. It does not appear that the superintendent consulted either the board or the attorney before acting under what was a misconception of his duty and of Burten's rights. Nevertheless, mistaken judgment on the part of Mr. Alderman, even though innocently or inadvertently made, can be no shield against the denial of a right plainly accorded Burten by this court's order and the applicable law controlling in the Fifth Circuit. Burten is, therefore, entitled to reinstatement, but since he has suffered no monetary loss he should not be awarded back pay or damages.

Let an order be entered accordingly.

DISMISSAL CRITERIA

for Personnel of the

EAST TALLAHATCHIE SCHOOL DISTRICT

Note: As required by the Court Order of 1971 and so that a uniform policy of dismissing and replacing employees of this school district may be known to all concerned, the following criteria is hereby established by the East Tallahatchie School Board of Trustees:

1. Dismissal of Teachers

   A. As a Result of Loss in Average Daily Attendance (ADA):

   a. teachers last employed in any non-academic subjects at the school that is effected by the ADA loss shall be the first teachers dismissed.

   b. teachers last employed in the academic area of the effected school shall be the next teachers dismissed.

   B. As a Result of Non-Recommendation of Principal or Superintendent, teachers shall be dismissed for any of the following reasons:

   a. inadequate teaching ability.

   b. non-cooperative attitude.

   c. immoral conduct at any time.

   d. other reasonable causes.

2. Replacement of Teacher Vacancies

   A. Dismissed Teachers Because of ADA Loss:

   a. concerned effort will be made to place these teachers in another school of this system, if a vacancy occurs in their certified teaching area.

   b. if they cannot be placed in this system, a concerned effort will be made to aid them in securing employment in another school system.

   B. Non-Recommended Teachers:

   a. any teacher who is not recommended by the principal for employment for the coming school year may request a conference with the principal and superintendent so that a clear understanding is available.

   b. the administration will make every effort to replace any vacancy with the same race of the previous teacher.

3. The East Tallahatchie School Board of Trustees reserves the right, under

law, to determine the status of any teacher under their jurisdiction.

(s) John E. Alderman

Secretary of Trustees and Superintendent of the East Tallahatchie School District