**Earlean McCORMICK, Plaintiff,**

v.

**ATTALA COUNTY BOARD OF EDU-CATION et al., Defendants.**

**No. EC7494–K.**

United States District Court,
N. D. Mississippi, E. D.

Jan. 16, 1976.

James O. Ford, Tupelo, Miss., for plaintiff.

William R. Ford, Kosciusko, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is an employment discrimination action brought by Mrs. Earlean McCormick, a displaced black schoolteacher, against the members of the Attala County, Mississippi, Board of Education, J. C. Foster, County Superintendent of Education, and Aaron Tolleson, Principal of McAdams Attendance Center. In this § 1983 action plaintiff claims violation of her First and Fourteenth Amendment rights in defendants' refusal to rehire her as a secondary school social studies teacher for the 1973–74 school term. Our jurisdiction is based upon 28 U.S.C. § 1343.

Plaintiff's essential claim is twofold. First, she contends that because the school system has undergone judicially-mandated school desegregation, she, as a black teacher, is protected by the employment strictures of *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5 Cir. 1970) (en banc), and thus is immune from discharge under the facts of this case. Alternatively and irrespective of *Singleton's* applicability, plaintiff contends that her non-renewal was constitutionally impermissible in that it was motivated by racial animus.

Full evidentiary hearing on the merits was held in this cause on January 13, 1976. At the close of the hearing, the court made an oral ruling dispositive of the case. The views thus expressed are incorporated herein to satisfy responsibilities under Rule 52, F.R.C.P., with findings of fact and conclusions of law as follows:

### I.

### BACKGROUND FACTS

Ms. Earlean McCormick, the plaintiff, is a 1968 black graduate of Mississippi Valley State University with a major in social sciences. She was first employed by the Attala County Board of Education for the school year 1969–70 and taught history and science at Long Creek Attendance Center, a formerly all-black, 12-grade school, under Ms. Viola Wragg, the principal. After this court entered a full desegregation order for the Attala County School District on August 7, 1970, the plaintiff was reassigned for the school year 1970–71 to McAdams Attendance Center, serving grades eight to twelve where she taught history and English under the principalship of J. C. Foster. Mr. Foster recommended plaintiff's reemployment for the school year 1971–72, when she taught history, government and sociology. During this school year Foster became the county superintendent, and Aaron Tolleson, in January, 1972, became principal at McAdams. Plaintiff was recommended for rehire by principal Tolleson for the 1972–73 school year, during which she taught history, health and government courses. Each employment contract granted to plaintiff was for the term of one school year. Each year she was employed as a minimum program teacher, paid with state funds, and not under the Title I program. Her salary for the 1972–73 school year was $6,110. She was not rehired for the 1973–74 term.

When her contract was not renewed, plaintiff applied to other school districts for teaching positions but was unsuccessful in obtaining professional employ-

ment. She also made efforts to obtain non-teaching employment, but failed. Unable to obtain any profitable employment, plaintiff attended Mississippi State University that year, obtaining a master's degree in August 1974. In May 1974, however, she reapplied to superintendent Foster for a vacancy in the social science department at Ethel Attendance Center; she also reapplied in April 1975 for similar employment. She received none.

On August 14, 1974, plaintiff commenced this action, seeking back pay and reinstatement, and requested preliminary injunctive relief. Shortly thereafter she obtained employment from the DeSoto County School Board as a teacher for the 1974–75 school year and withdrew her request for a preliminary injunction. Her employment at the DeSoto County Schools lasted only one year when the teacher she was replacing returned to duty. Since June 1975 plaintiff has been unemployed, unable to obtain a teaching position in the various school districts to which she has applied and also unable to obtain non-teaching employment.

## II.

### COUNTY SCHOOL DESEGREGATION

Since much of the thrust of plaintiff's claim is her contention that she was, at the time of the nonrenewal of her employment contract, a *Singleton*-protected teacher, with all that implies, it is necessary to review the history of desegregation in Attala County, with a view toward determining whether the mandate of *Singleton* has expired, and if so, when. Prior to the entry of our 1970 desegregation order, the total enrollment of the Attala County Schools was 2,687 pupils, of whom 1,456 were black and 1,231 were white. The first year after entry of the desegregation order, the total enrollment declined to 2,264, consisting of 1,454 blacks and 810 whites. This marked reduction was due primarily to the loss of large numbers of students who heretofore had attended Attala County Schools although residing in the adjoining counties of Carroll and Leake

and in the nearby Kosciusko Municipal Separate School District. After desegregation, students from those districts were assigned to public schools of the areas in which they resided. The steady pupil enrollment decline after the initial year of desegregation, which appears below, was due to loss of population of both races in rural Attala County, and not because of school consolidations:

| School Year | Black Students | White Students | Total Enrollment |
|---|---|---|---|
| 1969–70 | 1456 | 1231 | 2687 |
| 1970–71 | 1454 | 810 | 2264 |
| 1971–72 | 1373 | 862 | 2235 |
| 1972–73 | 1334 | 820 | 2154 |
| 1973–74 | 1256 | 744 | 2000 |

These figures appear without dispute in the admissions of fact set forth in the record. During the period of time under consideration, the racial makeup of the total faculty of all the schools in the district was as follows:

| School Year | Black Teachers | White Teachers | Total |
|---|---|---|---|
| 1969–70 | 63 | 61 | 124 |
| 1970–71 | 58 | 54 | 112 |
| 1971–72 | 53 | 57 | 110 |
| 1972–73 | 53 | 57 | 110 |
| 1973–74 | 51 | 56 | 107 |

As these figures demonstrate, the system-wide black-white teacher ratio remained relatively stable after desegregation, although the total staff decreased as student enrollment declined.

After the entry of the desegregation order, the district's eight attendance centers, which had previously operated as one-race schools except for the Ethel and Sallis Attendance Centers, were merged as to student bodies, faculties, staff and bus transportation routes. At the high school level, McAdams Attendance Center served grades eight through twelve for students residing in the Long Creek Attendance zone; Ethel High School served the upper grades for pupils residing in the Carmack and Greenlee zones. Reports on file with the court show the

racial composition of students and faculty at McAdams to be as follows:

| School Year | Black Pupils | Black Teachers | White Pupils | White Teachers |
|---|---|---|---|---|
| 1970–71 | 355 | 11 | 84 | 13 |
| 1971–72 | 378 | 11 | 82 | 12 |
| 1972–73 | 353 | 12 | 73 | 13 |
| 1973–74 | 331 | 11 | 46 | 13 |
| 1974–75 | 300 | 10 | 38 | 12 |
| 1975–76 | 300 | 10 | 39 | 12 |

For the school year 1970–71 and thereafter, all aspects of the different schools in the district were operated on a fully-integrated basis, with desegregated extra-curricular activities, services, programs, facilities, as well as interracial student bodies, faculties and staff.

Although student activity buses operated separately for boy and girl athletes, this was not a vestige of separate racial treatment, but a practice adopted at the suggestion of a black girl athlete. Notwithstanding a measure of conflict in the testimony, the substantial evidence is that regular school bus routes were established on a non-racial basis, with students of both races and sexes generally being transported on the same buses.

Again despite some conflict in the testimony, the overwhelming weight of the evidence shows that during the three years following the 1970 desegregation order, public school integration was well accepted by the black and white communities throughout Attala County and by school students, patrons, teachers and administrators. Consequently, the transition from dual to a unitary system of schools was accomplished without undue impediment or confusion. Particularly during the first two years following desegregation no significant incidents of any kind which could have impeded the desegregation effort were disclosed by the evidence. In the year 1972–73, the evidence touched upon two instances which should be noted.

In October 1972, an incident briefly occurred when the teachers withdrew for a faculty meeting, leaving the students in the gym. A bottle-throwing contest soon developed, and other articles were thrown about in the gym. To be sure, this was unseemly conduct on the part of the students, but no one was injured. When the faculty meeting was dismissed, the disturbance was promptly quelled by the teachers and there was no further misconduct. In January 1973, black students at McAdams refused to attend class and "sat in" at the gym until they were assured of the safety and well-being of a black male student who had been charged with alleged sexual misconduct involving a white female student in an incident which allegedly occurred away from school over the weekend and was the subject of an ongoing investigation by the sheriff's department. This incident occurred on a day when principal Tolleson was ill. The superintendent, however, came to the school and was able to assure the black students that no harm had befallen the boy student. All students were then dismissed from classes that day, but school resumed the next day without further incident. Plaintiff's evidence suggests no other occasions of student unrest during the entire three-year period from September 1970 through May 1973.

The absence of school dances and PE classes at McAdams pre-existed the entry of the desegregation order, and does not suggest the high school was not unitary. The evidence clearly established that the prevailing mores of the McAdams community have always disfavored school-sponsored dances; and that regular physical education classes were never held at McAdams in the former one-race school era.

There is no proof that in Attala County there were marches, demonstrations or organized boycotts by students of either race in protest of desegregated school policies. On the contrary, the entire desegregation effort appears to have been well-supported by its students, patrons, teachers and school administrators alike. To reiterate, the greatest degree of student enrollment reduction which occurred during the first year of desegregation was due to territorial requirements for attending other public schools,

and did not stem from non-support for the county's public schools or the mass withdrawal of white students to attend private, racially-discriminatory schools. Following the first year of desegregation, although there was a lesser decline in student enrollment, it was neither dramatic nor attributable to the consolidation of schools, but to a loss of rural population of both races in the rural sections of this county.

## III.

### EVENTS LEADING TO PLAINTIFF'S NON–REHIRE

During the 1972–73 school year, because of continuing decline in the ADA, or average daily attendance, the school board decided that it was necessary to reduce its teaching staff by eliminating two state-paid teachers and four Title I, or federally-paid teachers. Neither during this school year nor at any prior time had the school board adopted and posted written objective criteria for the dismissal of teachers in service.[1] No teachers had, in fact, been previously dismissed, and the reductions in faculty which had been accomplished up to that time had come through voluntary resignations and retirements.

In carrying out the directive of the school board, superintendent Foster notified Tolleson that there would have to be a reduction of one teacher on the McAdams faculty and that it was Tolleson's responsibility to determine who should not be rehired. In their discussions, Tolleson told Foster that since there were more teachers at McAdams in the social studies field than in any other department and the faculty top-heavy in that respect, the reduction could best be made in that field; and Tolleson proposed that the social studies teacher having the least seniority should be deleted from his forthcoming teacher recommendations. This was acceptable to the superintendent. On that basis, Tolleson deleted the plaintiff's name from his list of faculty recommendations. Up to this time, Tolleson had had no communication whatever with the plaintiff and did not discuss with her his intention not to rehire her for the ensuing school year.

On April 10, 1973, Foster did notify the plaintiff by letter that she was not being recommended for rehire by Tolleson and that the school board would not renew her contract. In his letter, the superintendent stated that if the plaintiff desired a hearing before the board relative to her nonrenewal, one would be granted her. The superintendent further stated that letters of recommendation for plaintiff in her efforts to find other employment would be furnished.

On April 13, 1973, plaintiff sought, and obtained, an informal conference with Tolleson at his home, at which she demanded to know the reasons for her nonrenewal. Tolleson's explanation is the subject of controversy, as we shall see. On April 16th, plaintiff wrote Tolleson requesting that he give, in writing, his reasons for not recommending her continued employment at the McAdams school.[2] Tolleson did not respond in any fashion to this letter, and on April 18th, plaintiff wrote to Foster, requesting a public hearing with the school board as soon as possible.[3] On April 25th, the superintendent notified plaintiff by letter that the school board would hold her requested hearing on May 22nd, and that she was entitled to have counsel present

---

1. See *Singleton,* supra, at 1218.

2. In this letter, plaintiff stated to Tolleson as follows:

   "Mr. Tolleson, I was really shocked, because over the past year you have not informed me, in writing or verbally, of the accusations you have against me, stating that you considered me as an unqualified teacher or if you were against my methods of teaching."

3. "I am writing in regard to your letter dated April 10, 1973, which stated my contract was not renewed for the 1973–1974 school year. Due to the fact that I was not recommended for a teacher position in the county, I am requesting a public hearing with you and the school board at the earliest possible date."

at the proceedings. The board hearing was convened as scheduled.

At the hearing, plaintiff appeared with attorneys on her behalf, who requested at the outset that the reasons for her non-rehire be stated into the record, and that evidence against the plaintiff be first tendered. When the school board declined both requests, on the advice of its attorney, plaintiff's counsel then called as adverse witnesses Tolleson, Foster and Frank Gowan, the Title I coordinator of the ESEA Program. Plaintiff did not testify at the hearing, although she could have done so, and no witnesses were called by the school board. At the conclusion of the hearing, the board took the matter under advisement, and at its June 5th meeting entered an order affirming the actions of the principal and superintendent in not submitting plaintiff's name for continued employment. In its order of affirmance, the board also made findings of fact as to the various reasons why Tolleson had not rehired plaintiff, based on the evidence presented at the hearing. At this hearing, Tolleson stated that he had been instructed by the superintendent to reduce his faculty by one; and since he had more teachers in social studies than any other department, he determined the reduction should be made there. He stated that besides the plaintiff, the other social studies teachers at McAdams were Henry Turnbo, black, with six years seniority; Irvin Wragg, black, with fifteen years seniority; and William Cain, white, who had seven years seniority and also performed extra duties as girls' basketball coach; and that plaintiff had less seniority than her McAdams colleagues in the social studies department. Tolleson gave seniority as his primary reason for not recommending the plaintiff. As a secondary consideration, he stated that on many occasions plaintiff failed to carry out school policies. According to Tolleson, plaintiff often failed to accompany her class to the cafeteria during the lunch period, although he instructed her to do so; she was often absent from class without excuse, frequently tardy, and carried food and drink into the classroom and persisted in eating, drinking and chewing gum during class in the presence of the students, all in violation of the teachers' handbook of written regulations.

Tolleson acknowledged before the board as well as in this court that the plaintiff did visit him at his home on Friday, April 13th, and he told her that among the "secondary reasons" for her non-rehire was his opinion that in her teaching she was placing undue emphasis on subjects not pertinent to her classes in government and history, and specifically she was overstressing race, sex and basketball. Tolleson later testified that this opinion was based upon his observations of posters and other materials seen in her classroom as well as reports received from white students and patrons.

Plaintiff's recollection of the April 13th conference is that Tolleson's objections to her treatment of racial matters formed the primary basis for his decision not to renew her contract. Plaintiff testified that in August 1972 Tolleson saw a poster in her classroom depicting interracial marriage, to which he objected, and also that he disapproved of her use of a booklet on Angela Davis, a black female defendant recently acquitted in a highly-publicized California criminal prosecution. Plaintiff also testified to another incident in January 1973, when the principal appeared in her class and openly reprimanded her for discussions she had had with students as to why, in the context of freedom of religion, blacks did not go to white churches. Tolleson admitted that these incidents had occurred, but he considered plaintiff to be a competent teacher and, despite objections from some white students and patrons about her teaching methods, she was qualified to teach the subject matter. Tolleson emphasized that he selected the plaintiff for non-rehire only because he was required to reduce his faculty by one and because of her lack of seniority in the social studies department, and that his decision was not based upon her race or on any considerations which had racial or sexual overtones.

At the board meeting and in this court, superintendent Foster stated that Ms. McCormick will be given first preference for the next "black" vacancy in the social studies field which occurs at any school in the county. Plaintiff's failure to be rehired to this point, despite her applications, has been the result of the school board's policy of replacing white teachers with white teachers and black teachers with black teachers. No black teacher vacancy has occurred in social studies since plaintiff applied for rehire, though several "white" positions have become vacant and were filled by white applicants. Since a much greater turnover has occurred among white teachers than among blacks, more white replacement teachers are being annually hired. The superintendent has stated his belief that the board's policy was promulgated under the impression that it was in compliance with, if not required by, *Singleton's* standard faculty provisions incorporated in this court's order of August 7, 1970.[4]

Among other things, the order commanded the school district, upon conversion from a dual to a unitary system, to "assign the staff described above [those then employed] so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system." Another portion of the *Singleton* order provides that if there is a reduction in teachers occasioned by the desegregation effort, "no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so." It is apparent that the school board is under the impression that these terms of the order authorize it to maintain fixed racial hiring ratios from year to year. Foster has frankly stated that the plaintiff's applications for reemployment are on file and will be considered when there is the next "black" teacher vacancy in the social studies field.

IV.

CONTROLLING LEGAL PRINCIPLES

At the outset, we note that this case involves not the demotion or dismissal of a black teacher, but her failure to obtain renewal of her employment contract upon its expiration.

Our first duty is to determine whether the plaintiff was in fact a *Singleton*-protected teacher at the time of her failure

---

4. That order provided, in pertinent part:

"A. *Desegregation of Faculty and Other Staff.*

The school board shall announce and implement the following policies:

1. All principals, teachers, teachers-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students. The school district shall assign the staff described above so that the ratio of Negro to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff respectively, in the entire school system.

The school district shall, to the extent necessary to carry out this desegregation plan, direct members of its staff as a condition of continued employment to accept new assignments.

2. Staff members who work directly with children, and professional staff who work on the administrative level will be hired, assigned, promoted, paid, demoted, dismissed, and otherwise treated without regard to race, color, or national origin.

3. If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition, if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the indi-

to obtain continued employment. Admittedly, she was a faculty member employed by the school system at the time of the entry of the desegregation order; it is also conceded that the district failed to adopt and post written objective and racially-nondiscriminatory criteria for teacher dismissals made necessary by school desegregation. Thus, if the process of desegregation was still underway in the spring in 1973, and unitary system of schools in Attala County had not then been successfully established, the plaintiff, being a *Singleton* teacher, could not have been permissibly discharged. That would be true because of the board's failure to adopt and post for public inspection written objective and racially-nondiscriminatory standards for dismissal. See *Singleton,* supra, at 1218. Additionally, if the board considered a dismissal standard based on seniority, it would have to be made applicable to all faculties of all the district's schools, and not just to one school. Concededly, the plaintiff had greater seniority than some social science teachers at the other county schools.

■ We hold on the facts and the law, however, that at the time of plaintiff's nonrenewal the process of desegregation had been successfully concluded by the Attala County Schools after three years of successfully operating under a full desegregation court order. A period of three years' experience in effective public school desegregation, absent extraordinary conditions encountered by a particular school district which may vitiate the effectiveness of full desegregation, is adequate to demonstrate the establishment of unitary schools. *United States v. Texas,* 509 F.2d 192 (5th Cir. 1975), *Lemon v. Bossier Parish,* 444 F.2d 1400 (5th Cir. 1971). In this very area this District Court has twice spoken, in *Pickens v. Okolona Municipal Separate School District,* 380 F.Supp. 1036 (N.D. Miss.1974), and *Keglar v. East Tallahatchie School District,* 378 F.Supp. 1269

(N.D.Miss.1974). A careful review of this record fails to disclose any circumstances of the type we noted in *Keglar,* supra, and *U. S. v. Coffeeville Consolidated School District,* 365 F.Supp. 990 (N.D.Miss.1973), which should postpone or serve to deter the accomplishment of full desegregation within this minimal three-year period established by federal courts. As we have noted, desegregation came to Attala County unaccompanied by discord; it has proceeded smoothly through a total community resolve that it succeed, and we judicially confirm that a unitary school system, in full compliance with all Fourteenth Amendment requirements, has existed in Attala County since the spring of 1973. We therefore conclude that the plaintiff, at the time of her non-rehire, could no longer claim *Singleton's* protection, and that her employment rights must be measured by general principles of contract and state law, subject always, of course, to constitutional imperatives. *McLaurin v. Columbia Municipal Separate School District,* 478 F.2d 348 (5th Cir. 1973); *Thompson v. Madison County Board of Education,* 476 F.2d 676 (5th Cir. 1973).

■ The undisputed facts show that the plaintiff was always hired for a one-year period. She does not claim that she had an understanding or agreement that her employment would last longer than one year, or that she had an objective basis for her expectancy for continued employment following the close of the 1972–73 school year. In Mississippi, state law does not provide for a system of job tenure for public school teachers. See *Jennings v. Meridian Separate School District,* 453 F.2d 413 (5th Cir. 1971). The defendants had the lawful right not to rehire the plaintiff for any reason, or for no reason at all, upon the expiration of the contract, so long as her constitutional rights were not violated. Neither were defendants required to grant plaintiff a hearing to determine whether legal cause existed before not

vidual dismissed or demoted, until each displaced staff member who is qualified has had

an opportunity to fill the vacancy and has failed to accept an offer to do so."

rehiring her, since a mere subjective expectancy of employment on the part of a teacher is not enough to require a due process hearing before the termination of the contract. There was no hint or suggestion by defendants of a public nature that plaintiff was not being rehired for cause, nor was any reason given for her nonrenewal that might involve her good name, reputation, or reflect upon her honor and integrity or her ability to obtain other employment. Indeed, the superintendent's letter was to the contrary, or to the effect that she would be provided with letters of recommendation to other school districts, if she wished such references. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Thompson v. Madison County Board of Education,* supra; *Skidmore v. Shamrock Independent School District,* 464 F.2d 605 (5th Cir. 1972).

Moreover, the Public School Fair Dismissal Act, Miss.Code Ann. § 37–9–101 et seq. (1975 Supp.), which prescribes a notice and hearing procedure for termination of schoolteacher employment, had not been enacted at the time of plaintiff's dismissal, and there was at that time no state law requirement for notice and hearing in terminations of this type. Neither had the school board of Attala County promulgated any hearing procedure applicable in this case.

■ Thus, plaintiff was not entitled, either under state or federal law, to due process hearing prior to her non-rehire unless her dismissal was for a constitutionally-impermissible reason. Defendants could, under *Roth* and applicable state law, fail to rehire plaintiff for no reason, or for any reason other than one constitutionally impermissible. The hearing which the board did give the plaintiff in this case was not legally required. Nevertheless, a hearing was granted and the plaintiff availed herself of it.

■ At this point, an interesting legal question arises. Though the board granted a hearing, Ms. McCormick called for a statement of reasons in advance of the hearing, but this was not provided. To be accorded full respect by this court, even a constitutionally-unnecessary hearing must comport with the due process standards laid down in *Ferguson v. Thomas,* 430 F.2d 852 (5th Cir. 1970). Under those standards, the defendants' hearing procedure in the case sub judice was clearly deficient in that plaintiff was given no notice of the reasons for her termination sufficiently in advance of the hearing date to allow her to meet the charges. Indeed, only through her own efforts did she succeed in discovering, from a reluctant Mr. Tolleson, a sketch of the reasons why the board failed to rehire her. This due process defect, while clearly not fatal to the defendants' case, does forbid us from giving to the board's administrative hearing the respect which *Ferguson* would otherwise command. Specifically, we cannot review the board's findings in accordance with the substantial evidence rule, nor do we choose to consider the evidence presented at the board's hearing as anything more than testimonial and documentary evidence which along with evidence offered at trial may tend to cast light upon the reasons for plaintiff's non-rehire. *Thompson v. Madison County Board of Education,* supra; *Green v. Board of Regents of Texas Tech University,* 474 F.2d 594 (5th Cir. 1973); *Duke v. North Texas State University,* 469 F.2d 829 (5th Cir. 1973).

The paramount issue remaining is whether plaintiff has carried her burden of proving by a preponderance of evidence that she was discharged for a constitutionally impermissible reason. The only possible basis for a finding of unconstitutional dismissal would be that plaintiff was not recommended for rehire by her principal for her alleged over-emphasis of racial and sexual matters in classroom teaching. In making this determination, the court is faced with a credibility choice between Tolleson and the plaintiff.

■ Tolleson, who appeared in court as a witness suffering from a heart con-

dition and contrary to his doctor's wishes, was at times vague and somewhat inconsistent, while Ms. McCormick had an obvious tendency to blow small matters out of proportion. What then were the dominant, substantial, or real considerations by which Tolleson was guided when he failed to include plaintiff on his list of teachers for rehiring? Certainly Tolleson did not fail to rehire plaintiff because she was black or because she was a woman. On the contrary, he had recommended plaintiff for continued employment for the previous year and superintendent Foster, while he was principal, had also recommended her for continued employment. Thus, there is no factual basis for believing that either administrator had personal animosity, ill-will or bias toward the plaintiff, although Tolleson's admonishment of plaintiff in the presence of her pupils was, we think, quite deplorable. It is true that the administrators differed somewhat from the plaintiff on the emphasis which they thought she should give to her subject matter. For example, Foster and plaintiff several years prior to her dismissal discussed how to present the slavery question in a study of American history and the Civil War. Foster endeavored to convey to plaintiff the impression that as a teacher she was obliged to teach history objectively and in an unemotional manner, yet the plaintiff apparently took umbrage to that suggestion. Similarly, plaintiff and Tolleson differed with respect to the booklet about Angela Davis and the poster regarding the interracial couple who had to go to court to obtain a marriage license. In any event, these discussions had no causal relation whatever to the plaintiff's not being rehired. Tolleson readily acknowledged that the plaintiff was a qualified and competent teacher. He had previously recommended her for continued employment; no doubt he would have done so again except for his instruction to reduce his faculty by one.

By selecting plaintiff for non-rehire he acted within the range of lawful discretion.[5]

█ Counsel for the plaintiff argues that racial discrimination should be inferred from statistical data in this case, citing *Keyes v. Denver School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), to the following effect: that in a school system with a history of segregation, the discharge of a disproportionately large number of Negro teachers incident to desegregation thrusts upon the school board the burden of justifying its conduct by clear and convincing evidence. Certainly that well-established principle is not applicable here. There is no proof whatever that a large number of black teachers were discharged. In fact, all black teachers who wished to remain in the system after the desegregation order had been rehired until the year in question. Nor does the record disclose systematic demotion of blacks in structuring biracial faculties. Moreover, the evidence here does not reasonably permit the inference that, when Tolleson was requested to make the reduction of one teacher, it was proximately related to public school desegregation in any manner. When the desegregation process had been completed, the subsequent loss of student population of both races in a rural area is hardly a consequence of public school desegregation. Rather, it is simply a fact of life where people live and move throughout the United States.

Finally, with respect to the school board's policy of replacing black for black teachers and white for white teachers, it is crystal clear that the board and superintendent labor under a misconception of the settled case law. The issue of whether *Singleton* required the maintenance of fixed hiring ratios for faculties first arose in *Carter v. West Feliciana Parish School Board,* 432 F.2d 875 (5th Cir. 1970). The first panel opin-

---

**5.** This factual determination obviates any potential First Amendment questions which might have arisen had plaintiff's discharge

been performed for reasons relating to her academic freedom.

ion in that case affirmed the district court by subscribing to the notion that black-white teacher ratios should remain stationary. This position, no doubt conceived as a rule of convenience, was abandoned and the initial panel opinion withdrawn. The same panel, composed of Judges Simpson, Wisdom and Coleman, then reversed the trial judge and enunciated the prevailing principle as to the durational meaning of *Singleton's* provisions once *Singleton's* faculty requirements are satisfied.

"The *Singleton* requirement which is also the requirement of the earlier decision of this court in *United States v. Hinds County School Board,* 5 Cir. 1969, 423 F.2d 1264, does not contemplate freezing the faculty ratio which is present when faculty desegregation takes place in the system. It contemplates rather that faculty desegregation will be accomplished by invoking the system-wide ratio as a rule for each particular school in the system and that thereafter the system will function from the standpoint of faculty and staff on the merit system. This means that once a unitary *system has been established the system-wide racial ratio may thereafter change from time to time as a result of nondiscriminatory application of objective merit standards in the selection and composition of faculty and staff.*" (Emphasis added)

That principle was reaffirmed in *Lee v. Macon County Board of Education,* 482 F.2d 1253 (5th Cir. 1973), as follows:

"The additional claim asserted on appeal that the school board was required to maintain the black-white teacher ratio existing in 1968 is rejected. We made it plain in *Carter v. West Feliciana Parish School Board,* 5 Cir., 1970, 432 F.2d 875, that the faculty desegregation requirement of *Singleton* did not '. . . contemplate freezing the faculty ratio . . .' 'This means that once a unitary system has been established the system-wide racial ratio may thereafter change from time to time as a result

of non-discriminatory application of objective merit standards in the selection and composition of faculty and staff.' "

The principle that the initial ratio must yield to merit qualifications after school unitization was applied by District Judge Gordon West in *George v. Davis,* 365 F.Supp. 446 (M.D.La.1973). The fallacy of a fixed ratio principle in hiring was also referred to by us in *Pickens v. Okolona Public School District,* supra, where the proof showed that instead of a reduction in a high school faculty there actually had been an increase. There, in the case of the non-rehiring of a black teacher, it was argued that as the faculty increased in size the percentage should call for employing more black teachers in protest of a policy of replacing blacks with blacks in teacher hiring.

Here, the proof shows that the district has been hiring more white replacement teachers than black replacement teachers, since a far larger turnover of white than black teachers occurs annually. In the social science field there has been no vacancy of a "black position" since Ms. McCormick left, yet several vacancies have arisen in "white" social science teacher positions. Is such a policy now constitutionally permissible in Attala County? We say no, that the policy amounts to a racial classification. The board can scarcely have it both ways, for having successfully attained a unitary school system by the end of the 1973 school year, the board is under a duty to hire teachers and administrators on the basis of objective merit standards, irrespective of race. The court issues its declaratory judgment to that effect, and enjoins the boards, superintendent and principals from continuing to hire professional persons on the basis of whether they fit a "black" or "white" position; defendants must be enjoined from failing henceforth to employ teachers solely on the basis of objective merit standards, irrespective of race. While we deny plaintiff back pay and do not at this time order her reinstatement, her appli-

cation for re-employment must be considered by defendants on the basis of objective merit standards, and not on the basis of any fixed racial hiring ratio.

Due to the unique factual circumstances in this case, the court concludes that, although back pay, immediate reinstatement and counsel fees must now be denied, the case will not be finally dismissed, but remanded to the docket of this court for such supplemental proceedings, if any, that may be instituted on behalf of the plaintiff within the next twelve months. The order will so provide.