461 So.2d 730 (1984)
BOARD OF TRUSTEES OF THE HATTIESBURG MUNICIPAL SEPARATE SCHOOL DISTRICT
v.
Peggy G. Gates.
No. 54216.
Supreme Court of Mississippi.
December 12, 1984.
*732 W. David Watkins, William L. Smith, Brunini, Grantham, Grower & Hewes, Jackson, Moran Pope, Pope & Pope, Hattiesburg, for appellant.
Thomas M. Matthews, Jr., Parsons & Matthews, Wiggins, for appellee.
Before PATTERSON, C.J., and HAWKINS and PRATHER, JJ.
PRATHER, Justice, for the Court:
The basic issue in this appeal involves the constitutional question of free speech balanced against the substantial evidence rule in a teacher non-renewal case. Peggy G. Gates was not reemployed by the Board of Trustees of the Hattiesburg Municipal Separate School District (the Board), and appealed that decision to Forrest County Chancery Court asserting that her non-reemployment was because of her exercise of her constitutional right of free speech in speaking out against the Board, participation in teachers' organizations, and grand jury investigations. The chancery court reversed the Board's decision finding that non-reemployment was due to Gates' participation in constitutionally protected speech and ordered that Mrs. Gates be reinstated.
The School Board appeals and argues:
(1) That the chancery court erred by substituting its judgment for that of the school board's where the school board's was supported by substantial evidence.
(2) That the non-renewal decision would have been made even in the absence of Mrs. Gates teacher organization and grand jury participation.
(3) That the non-renewal decision was made upon a rational basis to promote a legitimate educational interest.
We reverse and reinstate the School Board's non-renewal decision.

I.
Peggy Gates had served as a school teacher within the Hattiesburg system for 18 years. She spent 6 years teaching third grade students, a total of eight years teaching fourth, fifth and sixth grade students and 4 years teaching eighth grade students. She was a member of and served as officer to the Hattiesburg Association of Educators (HAE) and was a member of the Mississippi Association of Educators (MAE). She was elected by fellow teachers to represent Mary Bethune Elementary School on the Professional Affairs Committee, a laison group between teachers and the school administration. Gates actively participated in the HAE, MAE, and Professional Affairs Committees in promoting improvements in her profession.
Mary Buthene Elementary School principal, Pricilla Walker, refused to recommend Peggy Gates for reemployment for the 1981-82 school year. The grounds for such refusal were: (1) inadequate and/or improper classroom instructional skills; (2) excessive absences from the classroom; (3) refusal to abide by school policy with respect to leaves of absence; and (4) unprofessional conduct.
(1.) This is the key point for the first reason for the non-renewal, i.e., improper classroom instruction. Mrs. Gates' sixth grade class contained three different reading levels, and each level used a different basic reader. Mrs. Walker directed Mrs. Gates to place each student physically within his/her group. It was suggested that the group be formed as a circle providing a better instructional environment. Principal Walker accused Gates of not following directives to organize her classroom for reading purposes according to the reading level of the students. Mrs. Walker discussed these matters with Dr. Spinks, Superintendent of Education.
Gates answered this charge by stating that her students were in their proper groups, but instead of requiring each student *733 to move his/her desk, she merely kept the desks in straight rows and allowed the students to change seating arrangements. She contended that this provided a good instructional environment with minimal class disturbance.
Also cited as improper skills was excessive homework and improper testing. Charles Davison, professor at USM, had a son who was taught by Peggy Gates during the 1979-80 school year. Davison complained that his son was being subjected to excessive homework that amounted to no more than busy work. He stated that his son was often kept up until 11:00 or 11:30 at night attempting to complete his homework. Davison visited the school on one occasion and discovered Gates absent from the room. Davison's son had told him previously that she often left the room unattended. Davison's son related that he felt intimidated and his likeness for school was turning to hate.
Based upon Davison's experience as an educator and what his son had told him, it was his opinion that Mrs. Gates should not be rehired as an elementary school teacher. Davison, however, had no knowledge of Gates' conduct during the 1980-81 school year.
Gates countered these charges with proof that Davison's son was an A-B student and was very capable of handling the workload. She knew of his exceptional abilities and often encouraged him to enter essay contests, several of which he won or placed. Parents who testified in Gates' behalf had nothing but praise for her ability to motivate and educate their children.
Under the self-improvement goal setting program, meetings were held between Principal Walker and the teachers of Mary Bethune in October and November, 1980. Mrs. Gates refused to set goals for herself, terming herself adequate in the areas evaluated. Mrs. Walker suggested that Gates participate in the inservice programs to increase instructional skills. She also suggested that Gates improve in areas of motivation of students. Mrs. Walker commended Gates for providing a conducive learning environment and establishing good rapport with her students. While testifying, Walker termed this as a compliment only upon the decor of the classroom.
(2.) Excessive absences from the classroom was cited as another reason for non-reemployment. Principal Walker testified that Mrs. Gates suffered a diuretic problem and had to make frequent trips during the day to the bathroom. Gates stated that if such was the case she had Mrs. Lockett watch the children or obtain the teacher next door to watch. Lockett corroborated this, but stated that these absences often lasted for 10 to 15 minutes and occurred up to five times a day. Lockett also testified that Mrs. Gates frequently left the classroom to make or receive personal phone calls at times when she was not on break.
One occasion cited by Walker as illustrative of this problem was when the HAE then asked the PEER committee to investigate the system. Mr. Rubinsoff, a representative of the PEER committee, contacted Mrs. Gates for an interview on November 19, 1980 at 1:30 p.m. On November 18, the principal, Mrs. Walker, was not present at the school. Elaine Lockett, the school secretary, was left in charge. Lockett, as well as Gates and other teachers, testified that this is normal procedure. Mrs. Gates notified Mrs. Lockett that she would be out of her room from 1:30 until 2:30 (the end of the school day) on the 19th. Mrs. Gates' regular break was from 1:05 until 1:35. Normally during this break time, Gates took her students to the library where they were watched. On this particular occasion, Mrs. Gates took the students to the library, and Mrs. Lockett obtained an aide to watch the children from 1:35 until 2:30. Four weeks later, Mrs. Gates received a letter of reprimand from Mrs. Walker for failure to notify her about the absence.
(3.) In addition to inadequate instruction methods and excessive absences from the classroom, Mrs. Gates was accused of taking three days personal leave without approval. Mrs. Gates' husband, Bob Gates, was a vice-president of Hattiesburg Grocery Company. His employer, W.T. Russell, *734 required him to go to an annual convention held in March of each year in Chicago. Russell highly recommended that Bob take Mrs. Gates to the convention. Mrs. Gates had gone each prior year in which Bob was required to go. Mrs. Gates followed the proper procedure in submitting the request for personal leave form to her principal, Walker, asking for leave on March 16, 17 and 18, 1981. This request was returned to her denied by Superintendent Spinks, his reason being that this particular request was becoming an annual occurrence. Gates was aware that she had accumulated over 20 days of sick leave. Feeling that she was not being treated fairly, Gates talked with Board member, Charles Phillips, who advised her of a new leave policy which had been adopted which required the deduction of $25.00 per day from a teacher's salary to pay for the substitute teacher. Phillips advised her to resubmit her request with the new policy attached, which she did on February 23, 1981. Mr. Russell contacted Phillips and explained to him the situation with the convention. He felt that he had put Mrs. Gates in a bad position and wanted to clear up the matter.
Phillips advised Gates that Spinks had not gotten her second request. Gates and her husband then went to Spinks' home to hand him another request form at which time Spinks asked Gates to meet with him the following day in his office. Gates charged that at this meeting Spinks accused her of backing him into a corner by going over his head. At this point Spinks volunteered the statement that Gates' involvement with the grand jury and PEER committee had nothing to do with the denial of leave. The following week the sealed request was sent back denied.
Still feeling unfairly treated, Mrs. Gates decided to go on the three day trip anyway, despite being denied leave. On March 6, 1981, Gates left a note with Elaine Lockett indicating her intentions to be absent from class on the 16th, 17th and 18th. The note requested that a substitute be obtained, and it also advised that her lesson book was in the desk drawer. Gates saw that Mrs. Lockett gave the note to Walker outside the school building. A substitute was obtained for the three days, and Gates went on the trip. Mrs. Gates' request for personal leave was the only such request denied during the 1980-81 school year.
(4.) The fourth and final charge against Mrs. Gates was unprofessional conduct. Pricilla Walker and others by affidavit accused Mrs. Gates of speaking derogatively about the abilities of her students to persons outside the school system. Gates acknowledged that many of her students could not do simple math problems. Further, she expressed a great deal of frustration over the fact that many of her sixth graders were working math on a second grade level. In order to properly attempt to bring these students up to level it was necessary to use lower level workbooks. Many of her students could not solve simple math problems. The only suggestion Mrs. Walker made was to make the test easier. The charges against Mrs. Gates alleges that she accused the teachers of the lower grades of not properly teaching the students math. Gates denies these allegations, but admits voicing her frustrations that the students were not on grade level.
An additional charge of unprofessional conduct grew from an occurrence in the teacher mail room. Mrs. Gates was aware that another teacher, Martha Hayes, had submitted a personal leave request on February 23, 1981, the same day her own request for leave for the trip to Chicago was submitted. Mrs. Hayes had requested leave to attend a program in which her daughter was performing at another school. Boxes are provided in the teachers' lounge for the receipt of mail for each teacher, which boxes are open and cannot be locked or sealed. Mrs. Gates stated that in an effort to see whether Mrs. Hayes' request had been approved, she looked into Mrs. Hayes' mailbox, which was located directly above her own. Gates stated that she was able to see that the unfolded request had been approved. Gates was able to view the request without removing it from Mrs. Hayes' box. She viewed the *735 request in the presence of Mrs. Walker. Walker testified that the request was folded over and that in an effort to view it, Gates removed it from Hayes' box and unfolded it. Other teachers corroborated Gates' testimony that unfolded or uncovered mail can easily be seen without taking it from the boxes.
There was testimony from Buddy Watkins, athletic director, and Billy Rogers, principal, at Hawkins Junior High School that at a board meeting in April or May, 1981, Spinks told the principals of each school to evaluate disgruntled teachers closely. Concern was centered around remarks made about the school system and the fact that some teachers were not taking complaints through the proper chains of command. Reese Snell, principal of Blair High School, also related that Superintendent Spinks discussed some teachers who were not being loyal in every aspect. He mentioned two schools specifically, neither of which was Mary Bethune.

II.
Gates challenged the non-reemployment, claiming that the true reason of her dismissal was that she had exercised her First Amendment constitutional right to free speech.
When the July 1979 Grand Jury convened Mrs. Gates was selected as foreperson. This Grand Jury, as well as all of those of the past, investigated public agencies within its jurisdiction, including the Hattiesburg, Forrest County, and Petal School Systems. Dr. Sam Spinks termed the 1979 investigation mild as opposed to those of the past. Criticisms of the school system were made in the areas of equipment and building maintenance. Criticisms cited by Gates as having the most effect against her concerned the fact that the Hattiesburg system earned more revenue than other systems investigated, yet it paid a less expense percentage for teachers' salaries than the other systems. Spinks was unable to say whether past Grand Juries had investigated teachers' salaries but he did consider the 1979 report as favorable.
One incident that occurred which Mrs. Gates termed as intimidating to her was the fact that she was forced to go to Spinks' home to pick up subpoenaed documents. Spinks had earlier refused to deposit the documents with the circuit clerk. Gates had advised the District Attorney of her fear of losing her job, and he assured her that he would help in any way he could.
Gates' Grand Jury participation came at a time when she was teaching the sixth grade at Woodly Elementary School. She was transferred without request to Mary Bethune Elementary School for the 1980-81 school year, where she was assigned to the sixth grade. Spinks cited problems with handling students as a reason for her transfer. These problems cropped up during the 1979-80 school year. However, during the preceding year (1978-79) school year, as shown by her professional staff rating form, she was categorized as an excellent teacher and was recommended for reemployment by the principal, Liz Myers. Likewise, her rating for the 1979-80 school year was termed excellent again by Mrs. Myers and she again was recommended for reemployment. Prior to her transfer Mrs. Gates was serving as president of the HAE.
After the transfer in September of 1980, as president of the HAE, Gates participated in the drafting of a resolution requesting that the School Board comply with the state law requiring that the Board pay teachers for their preschool services during August by issuing paychecks during that month. This resolution was submitted to Dr. Spinks who had on a prior occasion stated that the Board did not recognize the HAE. The resolution was not adopted.
In December, 1980, Gates and about 18 other teachers appeared on a local news program and publically spoke out against administration policies involving teacher rotation, lack of pay during first month of school, PEER committee investigations, intimidation by the school administrators, and problems with standardized test scores.
*736 In February, 1981, Gates as president of the HAE, requested professional leave to go to Jackson as a lobbyist for the Mae education bill. She had gone to Jackson in previous years for this reason and felt as an officer of HAE, she should have been allowed to go in 1981. Dr. Spinks denied her request. Spinks likewise denied the request of five others to go to Jackson for the same reason, two of whom were at the time involved in litigation against the school.[1] No reason was cited on any of the leave forms for the denial. Of the six requests, four had the approval of the prinicipal only to be disapproved by Spinks. At the hearing Spinks cited lack of substitute teachers as a reason for the denials. Only one other professional leave request was denied during the 1980-81 year. Gates claimed that her request was denied because of her activities with the teacher organizations, grand jury investigations and the TV news program, and not because of lack of substitutes. Also, this was the first time Gates had ever been denied professional leave.
Hearing Officer Frank Montegue found that any one of the four charges would as a matter of law call for dismissal. He felt that the evidence supporting these charges was substantial and that Mrs. Gates' activities were not the cause of her non-renewal. The Board followed his recommendation and refused to rehire Peggy Gates for the 1981-82 school year.
Upon appeal the Chancery Court found that there were no procedural guarantees under the School Employment Procedures Act of 1977, Miss. Code Ann. § 37-9-101 et seq. (1980 Supp.) that had been violated. However, the chancery court reversed the Board's decision on two grounds: (1) that under local school district rules of the Hattiesburg Municipal Separate School District that the School District had failed to meet its own imposed burden of proof to show that non-reemployment was rationally related to some legitimate, educational interest of the District and (2) violation of her federal and state constitutional rights of free speech. The Board's decision was reversed by the Chancery Court and Mrs. Gates was ordered reinstated for the 1981-82 school year and also that she was entitled to be recommended for the 1982-83 school year, since the deadline for recommendation of teachers had passed.

III.
There is no contention by Mrs. Gates that statutory procedural requirements of timely notice and hearing were not met in this case. McDonald v. East Jasper County School District, 351 So.2d 531 (Miss. 1977); Jackson v. Board of Education of Oktibbeha County, 349 So.2d 550 (Miss. 1977); Board of Trustees of Pass Christian Municipal Separate School District v. Acker, 326 So.2d 799 (Miss. 1976).
There is no contention here that public school teachers have tenure, and that the school board is required to justify its decision for non-reemployment. On appeal a reviewing court is limited to considering that a non-reemployment decision was (1) supported by substantial evidence, (2) not arbitrary or capricious, (3) not beyond the power of the administrative agency to make, or (4) violated some state or constitutional right of the complaining party. Tanner v. Hazelhurst Municipal Separate School District, 427 So.2d 977 (Miss. 1983); Calhoun County Board of Education v. Hamblin, 360 So.2d 1236 (Miss. 1978); McCormick v. Attala County Board of Education, 407 F. Supp. 586 (N.D.Miss. 1976).

IV.
Initially in this opinion, this Court stated that in this case the decision here balances the free speech right of an individual teacher against the substantive evidence rule in a teacher non-renewal employment case.
Freedom of speech is guarded by both federal and state constitutions as the essence *737 of a democracy. U.S. Constitution, Amendments I and IV, Mississippi Constitution, Art. 3, Sec. 13.
Under the United States Supreme Court decisions, non-renewal of a teacher's contract predicated upon a teacher's exercise of First Amendment rights of free speech has been prohibited. Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In the Mt. Healthy case, supra, the Supreme Court stated that the burden of proof was on the teacher to show that the conduct was constitutionally protected and that such conduct was a substantial factor in the Board's decision. If the teacher meets this initial burden, then the board must show by a preponderance of the evidence that it would have made the same decision as to the teacher's reemployment in the absence of the protected conduct.
Under state decisions, this Court has also addressed non-reemployment teacher cases in which constitutional rights allegedly were violated. In Tanner v. Hazelhurst Municipal Separate School District, supra, this Court stated that:
"Initially the burden [of proof] is placed on the teacher to show that his conduct was constitutionally protected, and that such conduct was a `substantial factor' in the board's decision not to rehire." Once that teacher has carried that burden, the board must show by a preponderance of the evidence that it would have made the same decision as to the teacher's reemployment even in the absence of the protected conduct." (Citing Mt. Healthy City School District Board of Education, supra).
See also Calhoun County Board of Education v. Hamblin, supra.
Applying these guidelines to the instant case, this Court addresses first whether there was substantial evidence to support the Board's decision. A detailed summary was outlined of the testimony of Principal Walker, a teacher of 34 years experience with a master's degree, and AAA teaching certificate. The record contains many allegations of Ms. Walker and Superintendent Spinks and denials by Mrs. Gates. The Board as the factfinder judged the credibility of the witnesses and determined that Mrs. Walker had made a proper employment decision. There is substantial evidence to support the Board's finding. The one incident of Mrs. Gates' insubordination in taking personal leave when it has been denied is sufficient alone to justify the substantial evidence requirement. Even though Mrs. Gates' request was the only personal leave request denied during the school year, Mrs. Gates acted without permission.
The Board found that the decision of the superintendent and principal to not recommend reemployment was not in retaliation of Mrs. Gates' exercise of First Amendment constitutional rights.
On appeal, the chancery court found to the contrary that Mrs. Gates' exercise of free speech was a substantial factor in the Board's decision not to reemploy. Although the Board found as a fact that no constitutional infringement was present, let us analyze this case under the Mt. Healthy rule. Let us assume that Mrs. Gates' proof was sufficient to show that she had protected free speech rights, the exercise of which played a substantial part in the board's decision. Under the Mt. Healthy test, a court must go further to determine "if the board had shown by a preponderance of the evidence that it would have reached the same decision as to [teacher'] reemployment even in the absence of the protected conduct." If the same outcome would have been reached, the decision not to rehire does not necessarily amount to a constitutional violation justifying remedial action.
The evidence presented on behalf of Peggy Gates shows that her activities, beginning with the Grand Jury investigation up through her request for leave to go with her husband, conflicted with Superintendent Spinks. Principal Walker stated that her decision to not recommend Gates for *738 reemployment came in mid-March 1981. Two things happened in March.
First, Gates had a confrontation with Spinks in his office where he allegedly accused her of stabbing him in the back by going over his head. Second, Gates decided to go to Chicago on personal leave despite being denied leave. While the decision to not recommend Gates for reemployment was allegedly made in mid-March, Gates did not receive notice of such decision until April 3. This was approximately two weeks after her trip to Chicago. There is substantial evidence in the record to indicate that as Peggy Gates became more out-spoken against the administration she became more disfavored by the administration. On the other hand, there is also substantial evidence to show that Mrs. Gates was, at least in past years, a dedicated and talented teacher who held good rapport with most of her students and was categorized as an excellent teacher.
The decision not to reemploy Gates was made not because of her activities, but rather for her regard of school policy in taking leave without permission. The underlying reasons for the denial of leave are not relevant; only the fact that she left without permission is relevant. This reasoning supports the proposition that the constitutionally protected activities were not a "substantial factor" in the non-reemployment decision, as well as for the proposition that Gates would not have been reemployed anyway because of her insubordination in leaving without permission.
Section 37-9-111(4) Miss. Code Ann. (1972) states in part:
The board shall review the matter presented before it, or, if the hearing is conducted by a hearing officer, the record of the proceedings and, based solely thereon, conclude whether the non-reemployment determination is a proper employment decision, and shall notify the employee in writing of its final decision and reasons therefor.
The Board of Trustees is required by statute to make the ultimate employment decision on all teacher dismissal and non-renewal cases. If there is any credible evidence to sustain the decision of the administrative body's finding of facts, then those findings should not be overturned, even on conflicting evidence.
The administration offered substantial and credible evidence of reasons why it recommended non-renewal of Mrs. Gates. Since Mrs. Gates is nontenured, that finding of fact by the School Board must be respected.

V.
One additional topic needs to be addressed. The chancery court reversed the board's decision on an additional ground, and that was the Rules of Procedure of the Hattiesburg Municipal Separate School District. The rules provide that the school district has the burden of establishing that the decision was rationally related to some legitimate educational interest of the district. The chancellor considered this to be a substantive right granted to the teacher by the board, and he found no evidence to show that it would be detrimental to the school system to retain this teacher.
In the case of Connick, District Attorney In And For The Parish of Orleans, La. v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) the United States Supreme Court addressed a discharge of a government employee allegedly in violation of free speech guarantees. There the Court stated, as this Court has stated here, that the Court's task is to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 461 U.S. at 142, 103 S.Ct. 1686, quoting Pickering v. Board of Education, 391 U.S. 563, 568, 20 L.Ed.2d 811, 817 (1968). The Court stated that "a public employee had no right to object to conditions placed upon the terms of employment, including those which restricted the exercise of constitutional rights." 461 U.S. at 143, 103 S.Ct. at 1688.
*739 The language of Connick, supra, touches on this very issue, and we quote:
When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable... .
We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
461 U.S. at 146-47, 103 S.Ct. at 1690.
Certaining Mrs. Gates' participation as fore-person of the grand jury and her interview with the Peer Committee related to issues of public concern. The appearance of Mrs. Gates and others on a local news program addressed both issues of public concern and matters of personal interest. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement as revealed by the whole record." Connick, supra at 147-48, 103 S.Ct. at 1690.
Other comments on the newscast involved teacher rotation, lack of pay during the first month of school, and problems with standardized scores do not address matters of public import in evaluating the school system.
But in view of the entire record, conceding that Mrs. Gates exercised constitutional rights which entered into the board's decision not to reemploy, there is still a viable and valid reason alone to not rehire for reason of insubordination. That fact alone cannot be sidestepped and it alone supports the board's determination.
This Court, therefore, concludes that the chancery court should be reversed and the order of the Hattiesburg Municipal Separate School District reinstated.
REVERSED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P. JJ., and BOWLING, HAWKINS, DAN M. LEE and ROBERTSON, JJ., concur.
SULLIVAN, J., not participating.
NOTES
[1] See Weatherford v. Martin, 418 So.2d 777 (Miss. 1982), Jerry Martin and Laura Jo Edwards were both denied leave to go to Jackson as lobbyists.